UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-HC-2204-FL

| | |
|---|---|
| UNITED STATES OF AMERICA | **RESPONDENT'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| BRIAN WADE CASTLE | |

Brian Castle respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter pursuant to Federal Rule of Civil Procedure 52(a).

## INTRODUCTION

On November 15, 2017, the Government initiated this proceeding seeking to have Mr. Castle civilly committed under the Adam Walsh Child Protection and Safety Act of 2006, codified at 18 U.S.C. §§ 4247-4248. DE 1. Mr. Castle completed a 120-month sentence for possession of child pornography that expired on March 6, 2018, and he is currently detained at FCI Butner Medium I awaiting the outcome of this proceeding. DE 1-1 at 1. On July 24, 2018, the Court conducted an evidentiary hearing pursuant to 18 U.S.C. § 4247(d).

After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the Government has failed to establish by clear and convincing evidence that Mr. Castle is sexually dangerous, as required by the Act and by the United States Constitution.

1

## BACKGROUND

Brian Castle was born in 1961, in Washington.[1]  He was the youngest of six siblings; two of whom are now deceased.  Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5.  From birth until his teenage years, Mr. Castle was sexually abused by his older, now deceased brother, who would fondle him and perform oral sex on him.  Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5, 6-7.  Mr. Castle's mother frequently put him in this older brother's care.  Gov. Ex. 2 at 5; Gov. Ex. 4 at Resp. Ex. 2 at 6-7.  Mr. Castle was also sexually molested by an adult male neighbor, who performed oral sex on him and gave him pornography on one or two occasions.  Gov. Ex. 2 at 5; Gov. Ex. 4 at 17; Resp. Ex. 2 at 7.  Mr. Castle's parents separated when he was five years old and divorced when he was six.  Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. at 5.  His parents each remarried, and his stepfather was physically abusive to him.  Gov. Ex. 2 at 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5.  During his adolescence, Mr. Castle began getting into trouble and was placed in a boys' home, the Olympia Kiwanis Boys Ranch, from ages twelve to fourteen.[2]  Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5.  During this time, Mr. Castle was molested by a fifteen-year-old female who fondled him and performed oral sex on him.  Gov. Ex. 4 at 17; Resp. Ex. 2 at 7.

Mr. Castle then went to live with Robert T. Olson, president of the Boys Ranch, for approximately two years.  Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5.  After twice wrecking

---

[1]    Mr. Castle's personal history is laid out in each of the expert reports; Gov. Ex. 2 at 5-7; Gov. Ex. 4 at 15-17; Resp. Ex. 2 at 5-8.  It is also set forth in the presentence report.  Gov. Ex. 6 at 10.

[2]    The Boys Ranch later became the subject of at least $77 million in settlements for reported systemic physical and sexual abuse.  Mark Matassa, Kerry Murakami, David Postman, *O.K. Boys Ranch—How a House of Horrors Stayed Open—System Gets Blame, But People Failed to Heed Warnings*, The Seattle Times (Dec. 14, 1995), available at http://community.seattletimes.nwsource.com/archive/?date=19951214&slug=2157707; Connelly Law Offices, *Smith v. OK Boys Ranch*, available at https://www.connelly-law.com/results/civil-rights-results/smith-v-ok-boys-ranch/.

cars loaned to him by Mr. Olson, Mr. Castle felt embarrassed and left for San Francisco, California. Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5. He later returned to live with Mr. Olson for approximately six months before being declared legally emancipated and moving to Seattle, Washington. Gov. Ex. 2 at 5; Gov. Ex. 4 at 15; Resp. Ex. 2 at 5. While there, Mr. Castle supported himself by engaging in prostitution. Gov. Ex. 2 at 5; Gov. Ex. 4 at 16; Resp. Ex. 2 at 6. During this time, he also had an on-again, off-again relationship with a male who was two years younger than he was, from age fifteen to twenty-six. Gov. Ex. 2 at 6; Gov. Ex. 4 at 17; Resp. Ex. 2 at 8.

Mr. Castle dropped out of the tenth grade, but later completed his GED in 1997 while incarcerated. Gov. Ex. 2 at 5; Gov. Ex. 4 at 16-17; Resp. Ex. 2 at 6. He also earned several college credits at Portland Community College. Gov. Ex. 2 at 5; Gov. Ex. 4 at 17; Resp. Ex. 2 at 6. Mr. Castle has worked as a stereo installer, as a service attendant at a gas station, in the fast food industry, as a cashier, and as a ship painter. Gov. Ex. 2 at 6; Gov. Ex. 4 at 16; Resp. Ex. 2 at 6. He has also run a grocery and liquor store and worked in restaurants. Gov. Ex. 2 at 6; Gov. Ex. 4 at 16; Resp. Ex. 2 at 6.

Mr. Castle has one conviction for a non-sexual offense. In 1993, he was arrested for one count of possession of under two ounces of marijuana. He was found guilty, served one day in jail, and paid a fine of $100. Gov. Ex. 2 at 7; Gov. Ex. 4 at 19; Resp. Ex. 2 at 8.

Mr. Castle has been convicted of hands-on sexual offenses three times.[3] In 1987, when Mr. Castle was twenty-six years old, he befriended a thirteen-year-old boy in Portland, Oregon. He took

---

[3]      In addition to his three convictions, Mr. Castle has been accused three times of sexual conduct for which no charges were filed:

In 1993, Mr. Castle invited a thirteen-year-old boy that he met outside of a library to have lunch. The boy declined and went to police, accusing Mr. Castle of trying to take him home to

3

the boy to an arcade and a movie and paid for the boy to play video games. He then took the boy back to the bus in which Mr. Castle was living at the time, where he told the boy he would pay him cash to allow Mr. Castle to perform oral sex on him and masturbate him. This happened at least three times. Once, the boy brought a friend with him who was fifteen years old. Mr. Castle touched that boy's penis with his foot. A third boy, who was twelve years old at the time, was also brought to the bus: Mr. Castle performed oral sex on him and masturbated himself to ejaculation in front of the boy. For these offenses, Mr. Castle pleaded guilty to two counts of sodomy in the second degree and one count of sexual abuse in the second degree. After entering his guilty plea and before sentencing, Mr. Castle fled to Mexico. Gov. Ex. 2 at 7-8; Gov. Ex. 4 at 6-7; Resp. Ex. 2 at 8-9.

In 1995, an anonymous source advised El Paso Police and the Immigration and Naturalization Service that Mr. Castle and another man, Robert Donald O'Brien, were filming sexual activities with underage males. Mr. Castle cooperated with agents and admitted ongoing sexual conduct with undocumented Mexican males ranging in age from fourteen to seventeen since January 1994. Mr. Castle provided food, clothing, gifts, money, and shelter at his residence in exchange for sexual acts. Mr. Castle admitted that he introduced three of the minors to O'Brien at O'Brien's request for sexual purposes and provided officers a videotape in which O'Brien filmed

---

touch him. Mr. Castle was questioned and released without charges being filed. Gov. Ex. 2 at 8-9; Gov. Ex. 4 at 8; Resp. Ex. 2 at 9.

In 1996, a man in Portland, Oregon, saw a news report about Mr. Castle and told authorities that Mr. Castle molested him in 1982 to 1984, when he was about eight to ten years old. The statute of limitations had run and no charges were filed. Mr. Castle has no recollection of the conduct that forms the basis of these allegations and learned about them only recently. Gov. Ex. 2 at 11; Gov. Ex. 4 at 5-6; Resp. Ex. 2 at 10.

In 2007, an anonymous tip was called in to authorities, causing them to investigate Mr. Castle for "allegedly associating with street kids and engaging in sex with street kids." Mr. Castle passed a polygraph related to these allegations in January 2007 and vehemently denies that any such activities took place. Gov. Ex. 2 at 11; Gov. Ex. 4 at 13; Resp. Ex. 2 at 10-11.

4

the sexual acts. Mr. Castle appeared in three scenes on this videotape. Among the minors Mr.

Castle introduced to O'Brien was a fifteen-year-old male who lived with Mr. Castle for several

years. For this conduct, Mr. Castle pleaded guilty to one count of aiding and abetting the

persuading, inducing, enticing, and coercing of minors to engage in sexually explicit conduct for

visual depictions and was sentenced to 104 months of imprisonment, to be followed by thirty-six

months of supervised release. Gov. Ex. 2 at 9-10; Gov. Ex. 4 at 8-12; Resp. Ex. 2 at 9-10. He also

pleaded guilty in Texas state court to indecency with a child in the third degree and was sentenced

to twelve years of imprisonment, to be run concurrent to his federal sentence. Gov. Ex. 10.

Upon completion of that sentence, Mr. Castle then faced sentencing on his 1988 conviction,

for which he received a sentence of 120 months of imprisonment, to be followed by sixty months of

supervised release. Gov. Ex. 2 at 8.

Mr. Castle was released from federal custody on January 2, 2005, and began his term of

supervised release. Gov. Ex. 6 at 3. During his release, Mr. Castle participated in sex offender

treatment once per week for group sessions and once per month for individual sessions. Resp. Ex.

13 at 2. This treatment lasted for two years and three months and concluded only when the State of

Oregon did not renew its contract with that treatment provider. Resp. Ex. 3 at 140. He also

maintained employment, first with a food service agency and later as a cashier for a retail tobacco

store. Resp. Ex. 13 at 2. He reported as instructed to his probation officer and tested negative for

controlled substances on all of his random drug tests. *Id.*

During this time, Mr. Castle had two sexual relationships with adults, one with a twenty-

five-year-old male, which lasted for over a year, Resp. Ex. 3 at 17, and one with a nineteen-year-old

male, which lasted for approximately one month, *id.* at 116. Both of these relationships were

disclosed to Mr. Castle's probation officer. *Id.* at 117. Both of them ended on Mr. Castle's

initiative because "[t]hey acted juvenile, and I didn't need that in my life. I was doing adult things,

and they were not being adults." *Id.* at 18.

In July 2007, approximately two-and-a-half years into Mr. Castle's supervised release term,

a tip was called in to authorities alleging that Mr. Castle had child pornography on his computer.

Gov. Ex. 2 at 11-12; Gov. Ex. 4 at 13-14; Resp. Ex. 2 at 10-11. A search of his home revealed

"approximately 50 sexually explicit files depicting images of prepubescent children exposing

genitals, and children engaging in sexual activity with other children." Gov. Ex. 7 at 1. Also

located were approximately 140 sexually explicit pictures of young males appearing to be over the

age of twelve, though many appeared to be minors. *Id.* A flash drive contained a video with two

prepubescent males engaging in sexual acts with an adult male and an adult female. *Id.* For this

conduct, Mr. Castle was arrested for violating his state and federal supervision. *Id.* He was also

indicted for one count of possession of child pornography. *See* Gov. Ex. 5. Mr. Castle served two

years in state custody as a result of violating his state supervision. Gov. Ex. 6 at 1. He then pleaded

guilty to both the revocation charge and the child pornography charge in federal court and received

a sentence of fourteen months of imprisonment on the revocation of his supervised release, Gov.

Ex. 7 at 5, to be run concurrent to 120 months of imprisonment on the child pornography

indictment, Gov. Ex. 5 at 2. This sentence is followed by a five-year term of supervised release,

which will run until March 2023. *Id.* at 3. In addition to the eighteen standard conditions, Mr.

Castle will also be subject to the following special conditions:

> The defendant shall cooperate in the collection of DNA as directed by the probation
> officer, if required by law.

6

The defendant shall register, if required by law, with the state sex offender registration agency in any state where the defendant resides, is employed, carries on a vocation, or is a student and shall provide written notification of compliance with this condition as directed by the probation officer.

The defendant shall participate in a sex offender assessment and treatment program, as directed by the probation officer. The defendant shall abide by all rules and requirements of such program. This assessment and treatment program may include the use of the polygraph to assist in case planning and case monitoring.

The defendant shall have no contact with minors (in person, by telephone, through correspondence or a third party) unless approved by the probation officer and the Court.

The defendant is prohibited from being present within 100 feet of places where minor children under the age of 18 congregate, such as playgrounds and schools, unless approved by the probation officer.

The defendant shall not view, purchase, or possess any materials, including visual depictions of nudity and sexually explicit conduct, as defined at 18 U.S.C. § 2256(2) and (5)

The defendant is prohibited from using or possessing any computer(s) capable of connecting to any on-line service, including any handheld computing device, or any electronic device, without the prior written approval of the probation officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.

The defendant shall submit to a search of his computer (including any handheld computing device, any electronic device capable of connecting to any on-line service, or any data storage media) conducted by a probation officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall warn all individuals that have access to defendant's computer that it is subject to search and/or seizure.

The defendant is prohibited from accessing any on-line computer service at any location (including employment or education) without the prior written approval of the probation officer.

The defendant shall provide the probation officer with truthful and complete information regarding all computer hardware, software, electronic services, and data storage media to which the defendant has access.

7

Gov. Ex. 5 at 3-4.

Since he has been incarcerated on the child pornography conviction, Mr. Castle has been employed at UNICOR, earning positive performance ratings. Resp. Ex. 9. Mr. Castle has been charged with only five alleged infractions in the Bureau of Prisons in the last eleven years. On May 21, 2015, he was alleged to have possession of an unauthorized item, including pornography. But these photographs were photographs of young adult men, all over the age of eighteen. Resp. Ex. 2 at 12. On July 1, 2015, Mr. Castle was alleged to have images of males in sexually provocative poses in various states of undress. All of this material was returned to Mr. Castle after the investigation was conducted. *Id.* On July 24, 2015, November 28, 2017, and December 24, 2017, Mr. Castle was alleged to have sexually harassed another inmate, but he did not get a formal disciplinary report for this alleged incident and was never sanctioned for doing so. *Id.* Mr. Castle denies any sexual harassment took place. *Id.*

On December 21, 2016, Mr. Castle sent a letter respecting his declination of his precertification interview with Dr. Ross on the advice of counsel. Resp. Ex. 12. In that letter, Mr. Castle explained that he is "a changed person from the one who was first arrested in 1994." *Id.* He explained that he has "no interest in minors" and is "attracted to adult men of [his] age." *Id.* He explained that he completed two years and five months of sex offender therapy and treatment and passed all polygraphs pertaining to his compliance. *Id.* He explained that he will not participate in sex offender treatment in the Bureau of Prisons on the advice of his counsel, but that he will participate in a sex offender treatment program voluntarily after his release and will continue after care for the rest of his life. *Id.*

8

Mr. Castle's criminal sentence expired on March 6, 2018, and he remains in custody at FCI

Butner Medium I in Butner, North Carolina.

## DISCUSSION

The Adam Walsh Act provides for the civil commitment of "sexually dangerous person[s]."

18 U.S.C. § 4248. To prove that Mr. Castle is a "sexually dangerous person," the Government must

prove three elements by clear and convincing evidence: (1) Mr. Castle previously "engaged or

attempted to engage in sexually violent conduct or child molestation" (the "prior conduct" element);

(2) Mr. Castle currently "suffers from a serious mental illness, abnormality, or disorder" (the

"serious illness" element) as a result of which (3) Mr. Castle would have serious difficulty in

refraining from sexually violent conduct or child molestation if released" (the "serious difficulty" or

"volitional impairment" element."). *United States v. Antone*, 742 F.3d 151, 158 (4th Cir. 2014)

(quoting from 18 U.S.C. § 4247(a)(5)-(6)). These three elements are perhaps best viewed as (1)

looking to the past; (2) looking at the present; and (3) looking to the future. Clear and convincing

evidence is evidence that "produces in the mind of the trier of fact a firm belief or conviction,

without hesitancy, as to the truth of the allegations sought to be established[.]" *Antone*, 742 F.3d at

159 (internal quotation marks and citations omitted).

Three expert witnesses testified at the evidentiary hearing. Court-appointed expert Hy

Malinek, Psy.D, examined Mr. Castle and opined that he met criteria for commitment. Heather

Ross, Ph.D., did not examine Mr. Castle but nonetheless opined that he met criteria for

commitment.[4] Joseph J. Plaud, Ph.D., examined Mr. Castle for approximately five hours and

---

[4]      Upon advice of counsel, Mr. Castle declined to be interviewed by Dr. Ross, so her report
was prepared on record review alone. She noted in her report that this creates "inherent
limitations." Gov. Ex. 2 at 2.

opined that he did not meet the criteria for commitment. The Government filed a motion for an extension of time to file a Rule 26 expert report by Dr. Mark Hastings, which was granted, but no report was ever filed.

## I. THE GOVERNMENT HAS PROVEN, BY CLEAR AND CONVINCING EVIDENCE, THAT MR. CASTLE "ENGAGED OR ATTEMPTED TO ENGAGE IN SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION"

The Court finds that the first criterion for commitment under the Act, that Mr. Castle has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past, is satisfied. 18 U.S.C. § 4247(a)(5). All of the experts agree that Mr. Castle meets the first element of the Act by virtue of his prior convictions in 1988, 1996, and 1997, and Mr. Castle does not dispute that the Government has proven the first element.

## II. THE GOVERNMENT HAS FAILED TO PROVE, BY CLEAR AND CONVINCING EVIDENCE, THAT MR. CASTLE PRESENTLY "SUFFERS FROM A SERIOUS MENTAL ILLNESS, ABNORMALITY, OR DISORDER"

To meet its burden of establishing that Mr. Castle is "sexually dangerous to others," the Government must prove that he currently "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). The Act defines "sexually dangerous" as suffering "from a serious mental illness, abnormality or disorder *as a result of which* [the person] would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6) (emphasis added). The Act expressly contemplates a causal link between the person's current mental disease or defect and the likelihood of any future sexual offending. *See Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) (requiring a causal link between a finding of future dangerousness and the existence of a mental abnormality to satisfy due process). After a thorough

---

analysis of the evidence presented, the Court is not left with a definite and firm conviction that Mr. Castle presently suffers from either a diagnosable mental disorder or a serious functional impairment that would cause him serious difficulty refraining from sexually violent conduct or child molestation, and the Court therefore finds that the Government has not met its burden on the second element.

The experts varied in their diagnoses of Mr. Castle. Dr. Ross diagnosed him with other specified paraphilic disorder, sexually attracted to prepubescent and pubescent males; antisocial personality disorder; cannabis use disorder, moderate, in sustained remission, in a controlled environment; anxiety state, unspecified (by history); and depressive disorder, NOS (by history). Gov. Ex. 2 at 14. Dr. Malinek diagnosed him with pedophilic disorder, sexually attracted to males, non-exclusive and antisocial personality disorder. Gov. Ex. 4 at 27. And Dr. Plaud diagnosed him with cannabis use disorder, mild, in a controlled environment. Resp. Ex. 2 at 19. Dr. Ross and Dr. Malinek opined that the "serious illness" element is satisfied; Dr. Plaud opined that it is not.

The proper inquiry is whether Mr. Castle *presently* suffers from a serious mental abnormality, disease, or defect. *United States v. Springer*, 715 F.3d 535, 547 (4th Cir. 2013). The Court notes that Dr. Ross did not conduct an in-person interview of Mr. Castle, instead relying on record review alone. For this reason, the Court does not fully credit Dr. Ross's opinion on Mr. Castle's present functioning. The Court considers each diagnosis in turn.

*Paraphilic Disorders*

Only Dr. Malinek diagnosed Mr. Castle with pedophilic disorder.[5]  Gov. Ex. 4 at 27-28.  Dr. Ross diagnosed Mr. Castle with "other specified paraphilic disorder, sexually attracted to prepubescent and pubescent males."   Gov. Ex. 2 at 15.  Dr. Plaud did not diagnose Mr. Castle with any paraphilic disorder.  Resp. Ex. 2 at 16.

To support a diagnosis of pedophilic disorder, a person must meet the following criteria:

A.  Over a period of at least 6 months, recurrent intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).
B.  The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
C.  The individual is at least age 16 years and at least 5 years older than the child or children in Criterion A.

DSM-V at 697.  The diagnostic criteria for Dr. Ross's "other specified paraphilic disorder" would be the same, but the maturity level and age range of the children would be slightly older such that they were pubescent, rather than prepubescent.

As noted above, Dr. Ross's diagnosis must be discounted by the fact that she did not conduct an in-person interview of Mr. Castle.  In any event, Drs. Ross and Malinek's diagnoses with respect to prepubescent males suffer from two errors.  First, there is scant evidence that Mr. Castle, even historically, was ever attracted to prepubescent minors.  Only one of Mr. Castle's

---

[5]      Dr. Malinek opined that pedophilic disorder is "lifelong and chronic," Gov. Ex. 4 at 30, but that is inconsistent with the American Psychiatric Association's view.  It explains that "[p]edophilia per se appears to be a lifelong condition.  Pedophilic disorder, however, necessarily includes elements that may change over time with or without treatment: subjective distress (e.g., guilt, shame, intense sexual frustration, or feelings of isolation) or psychosocial impairment, or the propensity to act out sexually with children, or both.  Therefore, the course of the pedophilic disorder may fluctuate, increase, or decrease with age."  American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013) 699.

hands-on victims was younger than thirteen years old—he was twelve at the time of the offense—and lacked secondary sexual characteristics, Resp. Ex. 3 at 48-49; Mr. Castle explained at his deposition that this victim was "way too young" and he had "no interest" in him, Resp. Ex. 3 at 52-53.[6] And while the child pornography that formed the basis of Mr. Castle's 2007 indictment did include some images of prepubescent boys, neither Dr. Malinek nor Dr. Ross can point to any evidence that these images were the images Mr. Castle sought out or was interested in. Dr. Malinek also referenced images that were confiscated from Mr. Castle while in the Bureau of Prisons, noting only that they contained pictures of "males who appear or who are dressed to appear under the age of 18." Gov. Ex. 4 at 28. This description clearly may refer to post-pubescent males. As Dr. Plaud explained, Mr. Castle's "sexually offensive behavior pattern involves post-pubescent males." Resp. Ex. 2 at 17-18.

With respect to Dr. Ross's diagnosis of "other specified paraphilic disorder," there is a significant debate in the scientific community over whether a diagnosis of a paraphilic disorder related to attraction to postpubescent minors is legitimate. Efforts to include the diagnosis in the 2013 revision of the DSM were rejected. Even assuming that such a diagnosis could be legitimate in the appropriate case, the Government still has the burden to prove, by clear and convincing evidence, that Mr. Castle *presently* suffers from such a disorder.

It has not done so here. Even if Mr. Castle could have, at one time, been diagnosed with pedophilic disorder or an "other specified paraphilic disorder," he testified that he currently has an

---

[6]     A man reportedly alleged that Mr. Castle sexually molested him in 1982 to 1984, thirty-four to thirty-six years ago, when he was eight to ten years old. No charges were ever filed because the statute of limitations had run out and Mr. Castle has no recollection of these allegations. Gov. Ex. 2 at 11; Gov. Ex. 4 at 5-6; Resp. Ex. 2 at 10.

13

attraction to adult males.  Resp. Ex. 3 at 7.  He reports ending two relationships with younger adult males while on supervised release because "[t]hey acted juvenile, and I didn't need that in my life. I was doing adult things, and they were not being adults."  Resp. Ex. 3 at 18.  These self-reports are consistent with the fact that Mr. Castle's only hands-on offense against a prepubescent male occurred thirty-one years ago, and his last hands-on offense against a post-pubescent male occurred more than twenty years ago.[7]  Even with respect to his non-contact offense, Mr. Castle's possession of child pornography was eleven years ago.  Mr. Castle did not commit any hands-on offenses while he was on supervised release for two-and-a-half years in 2005 to 2007.

The question for purposes of civil commitment under the Adam Walsh Act is whether a person "*presently* suffers from a serious mental illness abnormality, or disorder, " and the Fourth Circuit has affirmed a finding that even if a paraphilic disorder diagnosis could have been applied historically, a person does not suffer a serious mental illness for purposes of the Act where the Government produced no evidence that the person engaged in inappropriate sexual conduct with a child in the last twelve years.  *Springer*, 715 F.3d at 547 (emphasis added).  The same logic applies here.  Mr. Castle does not presently suffer from a paraphilic disorder.

The United States Court of Appeals for the Fourth Circuit has never affirmed a civil-commitment judgment in the absence of a paraphilic disorder diagnosis, so the Court could end its

---

[7]     Mr. Castle has one thirteen-year-old hands-on victim, from the offense dating back thirty-one years, to 1987.  One thirteen-year-old boy alleged in 1993, twenty-five years ago, that Mr. Castle tried to get him to go home with him so he could feed him and touch his body parts.  Mr. Castle denies propositioning the boy, but acknowledges he was probably engaging in grooming behavior.  No charges were ever filed.  Dr. Malinek's report acknowledged that "although many 13-year-olds are prepubescent many are not."  Gov. Ex. 4 at 27.

14

analysis here.  Nonetheless, the Court proceeds to explain why none of the additional diagnoses

given by testifying experts qualifies as a "serious illness" for purposes of the Act.

*Personality Disorder*

Drs. Malinek and Ross diagnosed Mr. Castle with antisocial personality disorder.

The following criteria must be met to support such a diagnosis:

> A.  A pervasive pattern of disregard for and violation of the rights of others,
> occurring since age 15 years, as indicated by three (or more) of the following:
> 1.  Failure to conform to social norms with respect to lawful behaviors, as indicated
> by repeatedly performing acts that are grounds for arrest.
> 2.  Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for
> personal profit or pleasure.
> 3.  Impulsivity or failure to plan ahead.
> 4.  Irritability and aggressiveness, as indicated by repeated physical fights or
> assaults.
> 5.  Reckless disregard for safety of self or others.
> 6.  Consistent irresponsibility, as indicated by repeated failure to sustain consistent
> work behavior or honor financial obligations.
> 7.  Lack of remorse, as indicated by being indifferent to or rationalizing having hurt,
> mistreated, or stolen from another.
> B.  The individual is at least age 18 years.
> C.  There is evidence of conduct disorder with onset before age 15 years.
> D.  The occurrence of antisocial behavior is not exclusively during the course of
> schizophrenia or bipolar disorder.

Dr. Plaud opined that, in light of Mr. Castle's overall criminal history, the psychological

testing, and clinical interview, "there is no empirical or scientific basis to conclude that in February,

2018 [the date of Dr. Plaud's report] Mr. Castle could be validly diagnosed with this personality

disorder." Resp. Ex. 2 at 18.  For her diagnosis, Dr. Ross relied entirely on historical events.  Dr.

Malinek did consider Mr. Castle's time while in custody, but did not accurately state the facts: Dr.

Malinek stated that Mr. Castle has "act[ed] out sexually in custody," but the stated allegations of

alleged sexual harassment against him were deemed to be unfounded and never even formed the

basis for a formal disciplinary report.  Gov. Ex. 4 at 41.  The other two incidents involved pictures

15

of adult men. Resp. Ex. 2 at 12. Those are the only allegations of misconduct lodged against Mr. Castle in the last eleven years of custody.

Dr. Plaud persuasively explains that historic errors in judgment and abusive behaviors, even if significant, do not, standing alone, mean that a person "lack[s] the ability to control their behavior, especially in the present day context." *Id.* Mr. Castle's institutional conduct speaks persuasively to his ability to comply with social norms and tell the truth. He has been accused of only five institutional violations in his last eleven years of incarceration. Three of those were not even written up in a formal disciplinary report, and two involved pictures of young adult men. Mr. Castle was even given back the material that was the subject of the most recent of these two picture-related violations. The Court agrees with Dr. Plaud.

*Substance Abuse Disorder*

Drs. Ross and Plaud diagnose Mr. Castle with cannabis use disorder, in a controlled environment. Gov. Ex. 2 at 14; Resp. Ex. 2 at 19. Neither suggests that Mr. Castle has been using cannabis in the Bureau of Prisons, and Dr. Ross notes Mr. Castle's "negative urinalyses prior to his incarceration," and applies a specifier to reflect her view that this disorder is "in sustained remission." Gov. Ex. 2 at 16. Dr. Malinek rules out this diagnosis. Gov. Ex. 4 at 29. No expert suggests a causal link between any substance abuse on Mr. Castle's part and any risk of future sexual offending. The Court thus finds that this diagnosis cannot satisfy the "serious illness" element.

The Court finds the opinion of Dr. Plaud on the "serious illness" element to be more thorough and well-reasoned than the opinions of Drs. Malinek and Ross. Even if Mr. Castle met the criteria for one or more disorders at the time of his historical offenses, the Court finds that the

16

Government has not proven by clear and convincing evidence that Mr. Castle presently suffers from a serious mental illness, abnormality, or disorder under the Adam Walsh Act, as a result of which he would have serious difficulty refraining from sexually violent conduct or child molestation.

### III.   THE GOVERNMENT HAS FAILED TO PROVE, BY CLEAR AND CONVINCING EVIDENCE, THAT, AS A RESULT OF ANY SERIOUS MENTAL ILLNESS, MR. CASTLE WOULD HAVE SERIOUS DIFFICULTY IN REFRAINING FROM SEXUALLY VIOLENT CONDUCT OR CHILD MOLESTATION IF RELEASED

Even assuming that the Government could meet its burden on the "serious illness" element, the Court must also determine it has proven, by clear and convincing evidence, that Mr. Castle would have "serious difficulty in refraining from sexually violent conduct or child molestation if released" as a result of that serious illness.  18 U.S.C. § 4247(a)(6).  In *Kansas v. Crane*, the Supreme Court of the United States held that a person could not be civilly committed for sexual dangerousness unless there is "proof of serious difficulty in controlling behavior."  534 U.S. 407, 413 (2002).  This standard allows courts wide discretion in relying on a number of different factors—it does not have "a particularly narrow or technical meaning," nor is it demonstrable with mathematical precision."  *Id.*  The Court finds that the Government has not met its burden.

The Government relies almost entirely on Mr. Castle's historical conduct in its efforts to prove that he will have serious difficulty refraining from sexually violent conduct or sexual molestation in the future.  On this score, the Fourth Circuit's decision in *Antone*, 742 F.3d 151, is instructive.

Although acknowledging the two decades that have passed since Mr. Castle's last hands-on offense, Drs. Ross and Malinek discount that fact because Mr. Castle has only been in the community for two of those years.  Gov. Ex. 2 at 22; Gov. Ex. 4 at 41.  But *Antone* explained that

failure to "allow for a respondent's subsequent growth," even if more than a decade of that growth occurs behind prison walls, is reversible error. *Antone*, 742 F.3d at 169. Drs. Ross and Malinek also noted that Mr. Castle declined participation in a voluntary sex offender treatment program while incarcerated, failing to note that he did so on the advice of counsel. Gov. Ex. 2 at 22; Gov. Ex. 4 at 41. But *Antone* also noted that the offer of sex offender treatment for those against whom civil commitment is being sought is "effectively no choice at all" because "any treatment received would be at the cost of providing the Government with additional fodder to use against him in those proceedings." *Antone*, 742 F.3d at 167 n. 12. Dr. Ross also relies on Mr. Castle's "possession of risk-relevant sexual images while incarcerated," but she does not allege that any of these images were of minors. Gov. Ex. 2 at 22. Mr. Antone, too, attempted to have Maxim magazine delivered to him and a number of magazine cut-outs of "scantily-clad adult women" were found in his cell. *Antone*, 742 F.3d at 157 n.2. The Fourth Circuit described these incidents, along with two fights without serious injury, as "minimal" behavioral problems. *Id.* at 156. Finally, Dr. Ross mentioned an allegation of sexual contact during Mr. Castle's supervised release, but that allegation never served as the basis for state or federal charges or for the revocation of Mr. Castle's supervised release. Similarly, Dr. Malinek mentions such an allegation during Mr. Castle's custody, which was made "just weeks before" he examined Mr. Castle, but does not note that no formal disciplinary report ever issued. Gov. Ex.4 at 41. Despite no conviction or disciplinary report of hands-on sexual offending in more than twenty years, Dr. Malinek nonetheless opines that "there is no evidence that Mr. Castle has changed in his propensity for sexually inappropriate acting out" and expresses "doubt that he can contain and regulate his sexual urges." Gov. Ex. 4 at 41.

18

The analysis of Drs. Ross and Malinek is flawed. Mr. Castle has not committed a hands-on offense for more than twenty years, when he was a much younger man. He remained in the community for two-and-a-half years in 2005 to 2007 without committing an additional hands-on offense. And there is no record of founded allegations of sexual abuse by Mr. Castle while in prison. Even Mr. Castle's child pornography possession offense was now eleven years ago. Although Mr. Castle has twice possessed images in prison that may violate the rules of the Bureau of Prisons, no evidence has been presented that these images were not of adult men. No allegations of such images have been made in the last three years.

As Dr. Plaud persuasively explained, Mr. Castle has *never* recidivated with a hands-on offense after being punished. Resp. Ex. 2 at 3. He also has shown, through minimal institutional violations over a period of eleven years, that he has, in 2018, "the psychological and behavioral maturation to be managed in the community" on supervised release. *Id.* at 4. The conditions of Mr. Castle's supervised release are strict, and the Court has no doubt that he will be supervised closely in the community. *See* above at 6-7; Gov. Ex. 5 at 3-4. Although the Court is troubled by Mr. Castle's prior conduct, his testimony that he has matured, can see things from a different perspective than he previously could, and is committed to sex offender treatment appeared sincere, and the Court credits that testimony. Resp. Ex. 3 at 47; Resp. Ex. 12.

What is more, as of the date of the evidentiary hearing, Mr. Castle is now fifty-seven years old, already "within an age cohort associated with decreasing rates of sexual offense recidivism," and will be under federal supervision until he is sixty-one years old, within "an age cohort associated with the lowest rates of sexual offense recidivism." Resp. Ex. 2 at 3. The American Psychiatric Association explains: "Advanced age is as likely to similarly diminish the frequency of

19

sexual behavior involving children as it does other paraphilically motivated and normophilic sexual behavior." APA, DSM-5 at 699.

In addressing the "serious difficulty" element, the Court has also considered the "*Wooden* factors": (1) failures while on supervision, (2) resistance to treatment, (3) continued deviant thoughts, (4) cognitive distortions, (5) actuarial risk assessments, (6) impulsiveness, and (7) historical offenses. *United States v. Wooden*, 693 F.3d 440 (4th Cir. 2012). Many of these have been discussed, but the Court will briefly address their application to Mr. Castle.

First, with respect to failures while on supervision, Mr. Castle did plead guilty to possessing child pornography approximately two-and-a-half years into his term of supervised release. This was a clear violation of his supervised release conditions and is concerning to the Court. However, Mr. Castle was never charged with any hands-on offenses during this period, attended sex offender treatment for more than two years, and was otherwise compliant with his terms of supervision, including maintaining employment, passing random drug tests, and reporting as required to his probation officer. All in all, the Court views Mr. Castle's child pornography offense as a de-escalation from his prior hands-on offenses and evidence of some level of volitional control with respect to hands-on offending. His compliance with the other strict terms of his supervision is heartening in that it demonstrates respect for the courts' authority and a commitment to ongoing treatment. The Court finds, on balance, that this factor weighs in favor of Mr. Castle's release.

Second, with respect to resistance to treatment, Mr. Castle has participated in more than two years of sex offender treatment while he was on supervised release and passed all polygraphs designed to ensure his compliance. Although Mr. Castle has declined to participate in sex offender treatment in the Bureau of Prisons, he has done so on advice of counsel, consistent with the Fourth

20

Circuit's statement in *Antone* that "any treatment received would be at the cost of providing the Government with additional fodder to use against him in those proceedings." *Antone*, 742 F.3d at 167 n. 12. What is more, Mr. Castle has expressed his commitment to treatment upon his release and for the rest of his life. Resp. Ex. 12. The Court finds this commitment to be sincere and consistent with Mr. Castle's participation in treatment while on supervised release. This factor, too, weighs in favor of release.

Third, with respect to continued deviant thoughts, Dr. Plaud opines persuasively that Mr. Castle does not presently suffer from any paraphilic disorder. That opinion finds support in the fact that Mr. Castle has not been convicted of a hands-on offense in more than twenty years and has not been convicted of any sexual offense in eleven years. The images Mr. Castle possessed in prison appear to have been of adult men. Dr. Ross did not conduct an in-person interview of Mr. Castle and thus relies only on Mr. Castle's "history of sexual offending" to determine his current sexual interest. As Dr. Malinek's conclusion that Mr. Castle "continues to have a sexual interest in prepubescent males," this conclusion is without support in the record. Gov. Ex. 4 at 35. This factor also weighs in favor of release.

Fourth, with respect to cognitive distortions, Dr. Plaud persuasively explained that Mr. Castle, in 2018, "shows the psychological and behavioral maturation to be managed in the community." Resp. Ex. 2 at 4. And Mr. Castle testified persuasively that he understands the wrongfulness of his prior offenses and is committed never to repeat them. He explained: "I feel so ashamed of what I'd done," Resp. Ex. 3 at 21, and "being my age now and looking back, there was an attraction to these younger males, but knowing—seeing it now, it's ridiculous. You just—that

you have nothing—I have nothing in common with them," Resp. Ex. 3 at 12. This factor weighs in favor of release.

Fifth, with respect to the actuarial risk assessments, all three experts scored Mr. Castle on the Static-99R. Gov. Ex. 2 at 17; Gov. Ex. 4 at 17; Resp. Ex. 2 at 19. The Court is very familiar with this actuarial risk assessment from other cases pursuant to 18 U.S.C. § 4248. Drs. Malinek and Plaud each scored Mr. Castle as a six. Gov. Ex. 4 at 17; Resp. Ex. 2 at 19. Only Dr. Ross, who did not conduct an in-person interview, noted some uncertainty about whether Mr. Castle had lived with any lover for at least two years. Gov. Ex. 2 at 17. In light of the other experts' opinions and Mr. Castle's own testimony that he did, the Court finds the score of six to be accurate. This score correlates with a five-year re-offense rate of 6.5%, when compared with the routine corrections group, which Dr. Plaud testified persuasively is the correct comparator group in this circumstance. Resp. Ex. 2 at 20. Dr. Plaud also noted that the base rate of sexual offense recidivism for offenders released at Mr. Castle's current age is only 4%. *Id.* at 25.

All three experts went on to consider Mr. Castle's static and dynamic risk factors, and the Court finds most persuasive Dr. Plaud's analysis, which applied the Sexual Violence Risk-20 (SVR-20) to find seven psychosocial adjustment risk factors in Mr. Castle's case, all of which are historical rather than present or future-focused. Resp. Ex. 2 at 24. In the Court's view, Dr. Malinek's analysis of static and dynamic risk factors does not adequately distinguish between factors that are evident only historically and those that persist. And Dr. Ross's analysis suffers from the same error, which is understandable in light of her inability to interview Mr. Castle, but nonetheless undermines her assessment that Mr. Castle presently suffers from sexual preoccupation and deviant sexual interest. *See* Gov. Ex. 2 at 18-19. Dr. Ross candidly admits that she has

insufficient information to opine with respect to Mr. Castle's current social network and whether or not he lacks emotionally intimate relationships with adults. *Id.* This factor weighs in favor of release.

Sixth, with respect to impulsiveness, Dr. Ross concluded that Mr. Castle did demonstrate impulsivity through his prior substance abuse, repeated sexual offending, his failure to appear for sentencing in 1988, and his irregular employment history. Gov. Ex. 2 at 19. Dr. Malinek agreed, noting Mr. Castle's frequent relocations, irregular work history, and his "unawareness" of the consequences of his actions and inability to prevent himself from acting out. Gov. Ex. 4 at 34. Dr. Plaud noted Mr. Castle's self-report that he does not have problems with impulsivity. Resp. Ex. 2 at 22. The Court takes into account the opinions of each expert but notes that Drs. Ross and Malinek again focus significantly on the past, rather than on the present. What is more, Mr. Castle's historical pattern of offending involved grooming behaviors that appear to be at the opposite end of the spectrum from an impulsive orientation. The Court finds, on balance, that this factor neither weighs in favor of commitment or release.

Seventh, and finally, the Court considers Mr. Castle's historical offenses. Mr. Castle's historical offenses are reprehensible and that fact weighs in favor of commitment. However, the Court notes that Mr. Castle's last hands-on offense was more than twenty years ago, and his only possession of child pornography offense was eleven years ago. These facts heavily temper the salience of these significant, but dated, offenses.

Mr. Castle has made illegal and immoral choices, and he has committed abhorrent crimes, but the Government has not proven, by clear and convincing evidence, that he will have serious difficulty controlling his behavior in the future. "In the absence of clear and convincing proof that a

serious mental impairment causes an individual to have serious difficulty in controlling his behavior, the [C]onstitution requires reliance on the criminal law, rather than a civil commitment, to deal with that risk." *United States v. Wilkinson*, 646 F. Supp. 2d 194, 209 (D. Mass. 2009). The Government has not presented such clear and convincing proof, and Mr. Castle thus may not be civilly committed.

## CONCLUSION

For the foregoing reasons, the Government has failed to show by clear and convincing evidence that Mr. Castle suffers from a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty refraining from sexually violent conduct or child molestation if released. Accordingly, the Court concludes that Mr. Castle is not a sexually dangerous person and ORDERS that the Government release Mr. Castle forthwith to the custody and supervision of the appropriate United States Probation Officer.

Respectfully submitted this 18th day of July, 2018.

G. ALAN DUBOIS
Federal Public Defender

***/s/ Joseph H. Craven***
JOSEPH H. CRAVEN
Assistant Federal Public Defender
Senior Litigator
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Joseph_Craven@fd.org
N.C. State Bar No. 26116
LR 57.1 Appointed Counsel

JACLYN L. DILAURO
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Jackie_DiLauro@fd.org
Member of New York Bar
LR 57.1 Appointed Counsel

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served upon:

      JOSHUA B. ROYSTER
      MATTHEW LEE FESAK
      MICHAEL JAMES
      Assistant United States Attorneys
      310 New Bern Avenue, Suite 800
      Raleigh, NC 27601
      joshua.royster@usdoj.gov
      matthew.fesak@usdoj.gov
      mike.james@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on July 18, 2018, using the CM/ECF

system which will send notification of such filing to the above.

      This the 18th day of July, 2018.

                               ***/s/ Joseph H. Craven***
                               JOSEPH H. CRAVEN
                               Assistant Federal Public Defender
                               Senior Litigator
                               Attorney for Defendant
                               Office of the Federal Public Defender
                               150 Fayetteville Street, Suite 450
                               Raleigh, North Carolina 27601
                               Telephone: 919-856-4236
                               Fax: 919-856-4477
                               E-mail: Joseph_Craven@fd.org
                               N.C. State Bar No. 26116
                               LR 57.1 Appointed Counsel