IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-HC-2204-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| BRIAN WADE CASTLE, | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the court for determination of whether respondent Brian Wade Castle ("respondent" or "Castle") is a sexually dangerous person and thereby subject to civil commitment under 18 U.S.C. § 4248. Upon evidentiary hearing held July 24-25, 2018, and for the reasons set forth below, the court finds petitioner has not established by clear and convincing evidence respondent meets criteria for commitment under § 4248, and thus orders him released from custody.

## STATEMENT OF THE CASE

On November 15, 2017, petitioner filed and served the instant certification of a sexually dangerous person and petition as to respondent, staying respondent's release from Federal Bureau of Prisons' ("BOP") custody. See § 4248(a). At the time of certification, respondent was serving 120-month term of imprisonment at the Federal Correctional Institution located in Butner, North Carolina ("FCI-Butner"), following conviction for possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Respondent was also serving 14-month concurrent sentence for violating the terms of his supervised release. Respondent's projected release date at the time of certification was March 6, 2018.

Following certification, the parties filed expert reports as follows: 1) petitioner filed pre-certification report of Dr. Heather Ross, Ph.D., forensic psychologist at FCI-Butner, and Sumandeep Kaur, psychology intern, on November 29, 2017 (DE 8-1); 2) petitioner filed report of Dr. Hy Malinek, Psy.D., forensic psychologist in private practice and court-appointed examiner, on January 23, 2018 (DE 16-1); 3) respondent filed report of Dr. Joseph J. Plaud, Ph.D., forensic psychologist in private practice and defense examiner, on February 13, 2018 (DE 20).

On March 28, 2018, respondent moved to dismiss these proceedings, arguing § 4248 certification was not pursued within the four-year "catch all" statute of limitations applicable to civil actions under 28 U.S.C. § 1658, but conceding binding Fourth Circuit precedent forecloses such argument. On April 27, 2018, the court denied respondent's motion.

On July 17, 2018, the parties filed proposed findings of fact and conclusions of law.[1] On July 24, 2018, the court held the commitment hearing. At hearing, the parties stipulated that each examiner qualifies as an expert witness under Federal Rule of Evidence 702, and to the admissibility of all exhibits submitted in the parties' joint trial notebook. The court admitted such exhibits into evidence and heard testimony from the following witnesses: 1) respondent; 2) Dr. Malinek; 3) Dr. Ross, and 4) Dr. Plaud. The parties' joint trial notebook contained numerous exhibits, including, among other items, the expert reports identified above, respondent's October 8, 2009, presentence report (Pet'r's Ex. 6); respondent's July 3, 1996, presentence investigative report (Pet'r's Ex. 9); respondent's criminal records (Pet'r's Exs. 5, 7-8, 10-12); respondent's BOP disciplinary record (Pet'r's Ex. 13); respondent's deposition transcript (Resp't's Ex. 3); and respondent's BOP

---

[1] Respondent filed amended proposed findings of fact and conclusions of law on July 18, 2018, to account for additional criminal conviction the parties recently discovered.

employment, health, and additional disciplinary records (Resp't's Exs. 5-12, 15-19).

## FINDINGS OF FACT

The court derives the following description of respondent's background, including his sexual offense history, relationship/sexual history, prior community release and sex offender treatment, psychiatric and substance use history, and incarceration history, from the experts' reports and other documentary evidence, including respondent's BOP records and his presentence reports. Reference also is made to respondent's testimony at the commitment hearing.

While the meaning of certain actions taken by respondent are sharply debated, there generally is no dispute as to the fact of the occurrences described and where any exists, the court notes such dispute.

A.     Personal History

Respondent, 57, was born in Centralia, Washington on June 18, 1961, to Wesley Glenn Castle and Behulah May Castle, now Hedgers. (Malinek Report (DE 16-1) at 15). He was the youngest child of six siblings, which included one sister and four brothers. (Id.) Respondent's parents separated when he was 5 years old, and the children lived with their mother after the divorce. (Id.) Respondent's mother remarried shortly after the divorce. (Id.) Respondent reported his mother and stepfather were both severe alcoholics and his stepfather was physically abusive, from the time he came to live with respondent until respondent left the home when he was 11 or 12 years old. (Plaud Report (DE 20) at 5). Respondent also reported his oldest brother, Kerry, sexually molested him from his earliest memories until he was 13 years old. (Id at 6). Kerry molested respondent frequently, including fondling and performing oral sex on him. (Id.) Respondent also reported he was sexually molested by an adult male neighbor on two occasions. (Id. at 7). The neighbor

performed oral sex on him and gave him pornography.  (Id.)

Respondent was placed in a boys home for troubled youth when he was 11 or 12 years old, after he committed multiple burglaries.  (Id. at 5).  At hearing, respondent testified he had a positive experience at the boys home, though at age 13 he was sexually abused once by a male resident at the home.  The perpetrator anally sodomized respondent and masturbated in front of him.  Respondent left the boys home when he was 14 or 15 years old to live with a foster father, Robert T. Olson, who also managed the boys home.  (Malinek Report (DE 16-1) at 16).  Respondent reported a warm and healthy relationship with Mr. Olson, primarily because Mr. Olson did not judge him for being homosexual.  (Id.)  When he was 16 years old, respondent wrecked an automobile Mr. Olson gave him, and ran away to live in San Francisco.  (Plaud Report (DE 20) at 5).  After a brief stay in San Francisco, respondent returned to the boys home for approximately six months, at which time he was declared legally emancipated.  (Id.)  Respondent spent the next several years, from approximately age 17 to 19, traveling the country, residing for brief periods in Washington State, Mexico, Oregon, Florida, California, Texas, Louisiana, Illinois, and New York.  (Id.)  Respondent engaged in prostitution to support himself during these travels.  (Id. at 6).

Respondent dropped out of high school in the 10th grade, but earned his General Equivalency Diploma ("GED") in 1997 while incarcerated.  (Id.)  In 1986, at age 25, respondent moved to Portland, Oregon, where he worked as a stereo installer, service attendant at a gas station, in the fast food industry, and as a ship painter.  (Id.)  In 1988, respondent moved to Mexico City to avoid sentencing on sex abuse charges (described below), and managed a grocery and liquor store there for approximately three years.  (Id.)  Respondent then moved to El Paso, Texas in approximately 1991, where he worked as a cook at various restaurants and a cashier at a convenience store until his

1996 arrest.  (Id.)  With the exception of 30 months of supervised release between 2005 and 2007, respondent has been continuously incarcerated since 1996.  During his 2005 to 2007 period of community supervision, respondent testified he was a full-time community college  student, was employed part-time as a bartender and waiter, and later withdrew from school and took a full-time position as a cashier at a retail tobacco store.

Respondent stopped speaking to his father in the 1980s, and his father died in 2012.  (Id. at 5).  Respondent reports infrequent contact with his mother and one of his older brothers.  (Id.) Respondent also reports a positive relationship with an aunt and uncle, though he does not plan to live with them if released.  (Id.)

B.      Sexual Offense History

1.      1987 - 1988 Offenses

Between August 1987 and October 1987, at age 26, respondent victimized a 13 year-old male ("J.W.") when he was living in Portland, Oregon.  (Malinek Report (DE 16-1) at 6).  According to police reports, J.W. stated he had known respondent for approximately three years before the abuse took place, and respondent had taken him to arcades several times.  (Id.)  J.W.'s mother allowed him to spend time with respondent because respondent represented he was from a local Big Brother mentor program, although respondent denies he told J.W.'s mother he was from the program.  (Id. at 7).  In August 1987, respondent took J.W. to a video arcade and then to his residence, where he paid J.W. $10 to perform oral sex on him.  (Id. at 6).  Approximately a week later, respondent took J.W. to a movie, and then back to his residence, where he masturbated J.W.  (Ross Report (DE 8-1) at 7).  In October 1987, J.W. ran away from home and spent two nights with respondent.  (Id.)  On the second night, respondent reportedly performed oral sex on J.W. and placed his penis between

5

the victim's legs.  (Id.)  In his interview with Dr. Malinek, respondent noted that he first met J.W. at a park, where he paid J.W. $10 to perform oral sex on him in a public restroom.  (Malinek Report (DE 16-1) at 7).

In late 1987, respondent also performed oral sex on a second victim, B.H., a 12 year-old boy and friend of J.W.  (Id. at 6).  Upon meeting B.H., respondent promised to take him and J.W. places and purchase toys and other items for them.  (Ross Report (DE 8-1) at 8).  Respondent took both victims to an amusement center and then drove them to his residence,[2] where he allegedly masturbated himself to ejaculation in front of the boys and performed oral sex on both victims.  (Id.) At hearing, respondent admitted these allegations and acknowledged B.H. was prepubescent.

In January 1988, another police report was filed against respondent, alleging he fondled or molested two young male victims, J.W. (the same victim described above) and W.L., both of whom were on runaway status.  (Id.)  J.W. reportedly introduced W.L., a 15 year-old male, to respondent, and in January 1988 the victims visited respondent's residence.  (Id.)  Respondent made several sexual advances towards the victims and molested W.L. by touching his penis.  (Id.)

As a result of the Portland, Oregon police department's investigation into these allegations, respondent was indicted by state authorities on three counts of sodomy in the second degree and two counts of sexual abuse in the second degree.  (Malinek Report (DE 16-1) at 7).  In May 1988, respondent pleaded guilty to one count of sodomy in the second degree and one count of sexual abuse in the second degree and prosecutors dismissed the remaining charges.  (Id.)  Respondent absconded to Mexico prior to sentencing, and thus was not formally sentenced for these matters until November 2003.  (Ross Report (DE 8-1) at 7-8).  At that time, respondent received a sentence of 120

_____

[2]At hearing, respondent testified that he also abused B.H. in a park.

months imprisonment and 60 months probation. (Id. at 8). Special conditions of probation included sex offender treatment and no contact with minor males. (Id.)

2. 1993 Allegations

In 1992, respondent returned to the United States and settled in El Paso, Texas. In 1993, a 13 year-old male reported respondent approached him as he was waiting outside a library. Respondent allegedly invited the boy to his residence for lunch. (Malinek Report (DE 16-1) at 8). The boy refused, and respondent then offered to take the boy home so he could "touch his parts." (Id.) Police reports indicate respondent never touched the boy, and no charges were filed related to this incident. (Id.) Respondent admits he invited the boy to lunch but denies allegations that he made sexual advances.

3. 1995-1996 Offenses

In September or October 1995, respondent engaged a new victim, "L.C.," age 16, and provided him money, clothes, and other items in exchange for sexual acts. (Ross Report (DE 8-1) at 9). L.C., an undocumented male Mexican national, met respondent through "S.V." at the San Jacinto Plaza in El Paso, Texas, where respondent offered them $10 to perform oral sex on the boys. (Id.) Respondent then took the boys to his apartment where he performed oral sex on them. (Id.)

L.C. later returned to El Paso with his brother, A.C., and stayed with respondent for a week, during which time they engaged in sexual acts with respondent.[3] (Id.) During that week, L.C. and A.C. were asked if they would make a video with respondent for $50. (Malinek Report (DE 16-1) at 10). Respondent performed sexual acts on the boys for the video, and respondent's co-defendant

---

[3]A.C.'s age is listed as "not known" in the expert reports, but respondent has admitted he was between 14 and 17 years old. (Resp't's Proposed Findings (DE 30) at 4).

("O'Brien") did the filming.  (Id.)  The film was taken in O'Brien's van in a Wal Mart parking lot.  (Id.)

Thereafter, L.C. would periodically bring other underage male friends and family to respondent's home, and respondent would sexually abuse those boys as well.  (Id.)  For example, L.C. brought both "C.B." and "B.P." to respondent's apartment and stayed with him for approximately 30 days.  (Id.)  Respondent anally sodomized and performed oral sex on C.B., and B.P. anally sodomized respondent.  (Id.)  Respondent provided the victims with money and clothing.  (Id.)  L.C. later brought his brother "B.C." to respondent's home.  (Id.)  Respondent fellated and fondled B.C. and L.C. and provided the victims money and clothing.  (Id.)

In January 1996, the El Paso police department and Immigration and Naturalization Service ("INS") began investigating respondent after receiving reports he was living with a 15 year-old male undocumented Mexican national and was producing child pornography.  (Id. at 9).  In January 1996, the El Paso police department conducted a traffic stop on respondent, and discovered two juvenile males in his vehicle.  (Ross Report (DE 8-1) at 9).  The juveniles were turned over to U.S. Border Patrol agents, and respondent was permitted to leave, but officers continued surveillance of respondent's activities.  (Id.)  That same day, officers observed him in downtown El Paso speaking with "J.G.," a young male who appeared to be in his early teens.  (Id.)  Authorities later observed J.G. leaving respondent's residence and detained him for questioning while respondent was arrested.  (Id.)  J.G. reported he was 14 years old, and respondent had anally sodomized and fellated him.  (Id.)  Upon questioning, respondent admitted he had sex with J.G.  (Id.)

During his arrest, officers also met "P.R.," a young male who reported he was 15 years old and had been living with respondent for several years.  (Malinek Report (DE 16-1) at 9).  P.R. stated

he met respondent at the San Jacinto Plaza area in El Paso, where respondent had approached him and offered to buy him food. (Id.) P.R. disclosed respondent had engaged in sexual acts with him, but he was not clear about when those sexual acts began. (Id.) P.R. further stated that respondent and O'Brien gave him a video game system and cash in exchange for sexual acts with O'Brien. (Id.)

During search of respondent's residence, respondent showed officers the homemade video described above, depicting homosexual acts between respondent and several minors. (Id.)

At the time of his arrest, respondent admitted he sexually abused P.R., B.C., and L.C. (Id. at 10). He also admitted he possessed a copy of the video of respondent performing sexual acts on L.C. (Id.) Dr. Malinek also questioned respondent about these charges. Respondent claimed that he was primarily picking up young males at the San Jacinto Plaza at the behest of O'Brien, who produced child pornography, had sex with the children, and paid respondent to approach potential victims and arrange sexual encounters with O'Brien. (Id. at 12). Respondent also stated that he "had nothing to do with the filming" but acknowledged he had sex with the boys in the video. (Id.)

In February 1996, respondent was charged with a number of federal offenses related to exploitation of children and producing child pornography, and ultimately pleaded guilty to aiding and abetting the persuading, inducing, enticing, and coercing of minors to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct. (Ross Report (DE 8-1) at 10). On July 23, 1996, respondent was sentenced to 104 months imprisonment, and a three-year term of supervised release. (Id.) Conditions of supervised release included: 1) shall not own or possess firearms or destructive devices; 2) shall participate fully and attend sex offender counseling programming; and 3) shall refrain from unlawful use of a controlled substance and submit to drug testing as required by the probation officer. (Id.)

In addition, as a result of the conduct described above, respondent pleaded guilty in Texas state court to indecency with a child in the third degree, and was sentenced to 12 years imprisonment, to run concurrent to his federal sentence. (Resp't's Proposed Findings (DE 30) at 5).

4.      2006 Allegations

Respondent completed his state and federal terms of imprisonment on January 4, 2005, and began serving his three-year term of federal supervised release and state parole in Portland, Oregon. (Ross Report (DE 8-1) at 11). In late 2006, the Portland, Oregon police department began investigating respondent after receiving reports he was having sex with certain unidentified "street kids." (Malinek Report (DE 16-1) at 13). Respondent passed a polygraph examination regarding this incident and no charges were filed. (Id.) Respondent denies these allegations.

5.      2007 - Instant Offense

In July 2007, respondent's probation officer received reports respondent was showing child pornography on a personal computer at his residence and elsewhere. (Id.) Authorities searched respondent's residence and found the following items: 1) 90 images of suspected children engaged in sexually explicit conduct and 17 videos of suspected children engaged in sexually explicit conduct, on his computer; 2) 50 sexually explicit files depicting images of prepubescent children's exposed genitals and children engaged in sexual activity with other children, and approximately 140 sexually explicit images of young males appearing to be over the age of 12, though many appearing to be minors, on certain flash drives; and 3) approximately 120 images of children or suspected children engaged in sexually explicit acts on a thumb drive. (Id. at 13-14). Additionally, the thumb drive contained at least two videos depicting prepubescent children engaged in sexual acts. (Id. at 13). The filenames for the images/videos contained words such as "preteen" and "PTHC" (pre-teen

10

hardcore).  (Pet'r's Proposed Findings (DE 28) at 6-7).

During the search of his home, authorities seized toys, stuffed animals, candy, condoms and electronic devices.  (Plaud Report (DE 20) at 11).  In his interview with Dr. Plaud, respondent stated that the candy was for his own consumption, and the toys and stuffed animals were for an art project. (Id.)

On July 18, 2007, respondent was arrested for possession of child pornography and, after serving 14 months in state custody for violating the terms of his parole, he was indicted on federal child pornography charges in the District of Oregon.  (Malinek Report (DE 16-1) at 13-14). Respondent pleaded guilty to possession of child pornography and was sentenced to a term of 120 months imprisonment in BOP custody, a concurrent term of 14 months imprisonment for violating the terms of his supervised release, and a five-year term of supervised release.  (Id.; Ross Report (DE 8-1) at 11-12).  Special conditions of his supervised release include the following:

> The defendant shall cooperate in the collection of DNA as directed by the probation officer, if required by law.
>
> The defendant shall register, if required by law, with the state sex offender registration agency in any state where the defendant resides, is employed, carries on a vocation, or is a student and shall provide written notification of compliance with this condition as directed by the probation officer.
>
> The defendant shall participate in a sex offender assessment and treatment program, as directed by the probation officer.  The defendant shall abide by all rules and requirements of such program.  This assessment and treatment program may include the use of the polygraph to assist in case planning and case monitoring.
>
> The defendant shall have no contact with minors (in person, by telephone, through correspondence or a third party) unless approved by the probation officer and the Court.
>
> The defendant is prohibited from being present within 100 feet of places where minor children under the age of 18 congregate, such as playgrounds and schools, unless

approved by the probation officer.

The defendant shall not view, purchase, or possess any materials, including visual depictions of nudity and sexually explicit conduct, as defined at 18 U.S.C. § 2256(2) and (5).

The defendant is prohibited from using or possessing any computer(s) capable of connecting to any on-line service, including any handheld computing device, or any electronic device, without the prior written approval of the probation officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.

The defendant shall submit to a search of his computer (including any handheld computing device, any electronic device capable of connecting to any on-line service, or any data storage media) conducted by a probation officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall warn all individuals that have access to defendant's computer that it is subject to search and/or seizure.

The defendant is prohibited from accessing any on-line computer service at any location (including employment or education) without the prior written approval of the probation officer.

The defendant shall provide the probation officer with truthful and complete information regarding all computer hardware, software, electronic services, and data storage media to which the defendant has access.

(Pet'r's Ex. 5 at 3-4).

Respondent's only additional criminal conviction beyond the sexual offenses described above is a 1993 conviction for possession of less than two ounces of marijuana. (Ross Report (DE 8-1) at 7).

C.    Relationship and Sexual History

According to respondent's 1996 presentence report, penile plethysmography (PPG) evaluation conducted in 1988 recorded respondent's highest sexual arousal was to teen and pre-teen males. (Pet'r's Ex. 9 at 162). Respondent reports approximately eight sexual encounters with

females, primarily one-night stands with no long-term relationships. (Malinek Report (DE 16-1) at 17).

Respondent estimated he has had sexual encounters with approximately 20 to 40 men, with the majority over 18 years old. (Id. at 18). Respondent admitted, however, that he has had sex with approximately 10 to 15 adolescent males. (Id.) Respondent emphasized to Dr. Malinek that he is not sexually interested in children, but also stated, "[t]eenagers are gorgeous . . . you enjoy sex with a man. You have more in common with a man. You can converse and its consensual." (Id.)

Respondent reported one long-term relationship with another male who was approximately two years younger than respondent, from age 15 to 26. (Id. at 17-18). At hearing, respondent testified the relationship was unstable and they did not live together for long periods of time.

Respondent also had two short-term relationships with adult males (ages 25 and 19, respectively) when he was on supervised release between 2005 and 2007. (Id. at 18). Both men had prior criminal records, (id.), and respondent testified at hearing he viewed child pornography while engaging in sex acts with them. The relationship with Jason, the 25 year old, lasted approximately 18 months, during which time they lived together. (Id.) The relationship with the unidentified 19 year old was unstable and short-term. (See id.) The 19 year old allegedly introduced respondent to child pornography. (Id.)

D.     Prior Community Release and Sex Offender Treatment

As noted, respondent was released to the community after incarceration for his 1996 convictions on January 4, 2005. (Ross Report (DE 8-1) at 11). He remained in the community until arrested for possession of child pornography and violating the terms of his supervised release on July 18, 2007. (Id.) Respondent testified that during this time he attended community college, worked

as a cook, waiter and bartender, and attended sex offender treatment (described below).  At his probation officer's request, respondent later secured full-time employment as a clerk at a tobacco store.  (Malinek Report (DE 16-1) at 17).  Respondent testified he continued to attend sex offender treatment while employed at the tobacco store, despite at times working 70-80 hours per week.

From approximately January 2005 to April 2007, respondent participated in sex offender treatment at Child/Adult Intervention Services, Inc. in Portland, Oregon as a condition of supervised release.  (Ross Report (DE 8-1) at 7; Malinek Report (DE 16-1) at 23-24).  Treatment included weekly group therapy sessions, individual sessions with a psychiatrist, polygraph examinations, and aversion therapy.[4]  (Malinek Report (DE 16-1) at 23).  Treatment reports indicate he regularly attended treatment and received satisfactory reports.  (Id. at 24).  Respondent had one "inconclusive" polygraph result in May 2005, but passed all remaining polygraphs between August 2005 and January 2007.  (Ross Report (DE 8-1) at 7).  According to respondent, the program was cancelled because his probation office did not renew its contract with the treatment provider.  (Malinek Report (De 16-1) at 24).  Respondent testified he learned a significant amount about his cycle of offending and coping strategies during the program, and he never committed a "hands on" offense while in treatment.  Respondent, however, committed the instant offense of possession of child pornography shortly after his treatment terminated.  Respondent states he will return to outpatient sex offender treatment after his release as required by the terms of his supervised release.  (Id.)  Respondent has refused to participate in the sex offender treatment program at BOP, on the advice of his attorney.  (Resp't's Proposed Findings (DE 30) at 18).

---

[4]Respondent testified aversion therapy involved inhaling ammonia while fantasizing about and masturbating to memories of his past offenses.

E.    Psychiatric and Substance Use History

Respondent has a history of daily marijuana use beginning at age 15 and presumably ending when he was arrested in 1996 at age 34.  (Ross Report (DE 8-1) at 6).  He has occasionally used peyote, psilocybin mushrooms, unspecified pills, LSD, and cocaine.  (Id.)  Respondent submitted to multiple random drug tests when he was on supervised release between 2005 and 2007, all of which were negative for illegal drug use.  (Id.)  Respondent reports casual alcohol use and denies that he is currently addicted to any illicit substances.  (Malinek Report (DE 16-1) at 18-19).

Respondent has historical diagnoses of anxiety and atypical depression, and he has been prescribed Buspirone for anxiety and Zoloft for depression for the past ten years.  (Id. at 22).  Respondent also has been diagnosed with pedophilia and personality disorder not otherwise specified.  (Id.)  Although respondent frequently has complained of both anxiety and depression during his current incarceration, he has refused to participate in psychotherapy services.  (Id.)

F.    Current Incarceration

Respondent has incurred one infraction during his 10-year period of incarceration for the instant offense.[5]  (Malinek Report (DE 16-1) at 20).   In May 2015, a packet of property was confiscated from respondent's cell, which contained 2 pages cut from a magazine featuring male models, 32 loose color photographs, and 41 pages of thumbnail photographs, all featuring images of males in sexually provocative poses while in various stages of undress.  (Id.)  The males in the photographs "appear or are dressed to appear under the age of 18."  (Id.)  At hearing, respondent

---

[5]While incarcerated for the 1996 offenses, respondent was involved in an incident where a prison gang physically assaulted him because they believed respondent performed oral sex on another adult male inmate. Respondent, however, denied that he performed oral sex on the inmate.  Respondent was also convicted of possessing an unauthorized item, phone abuse, and possession of unauthorized money during this period of incarceration.

testified he ordered images of 18-25 year-old men, with hair, in sexually suggestive poses. Respondent was also found to be in possession of sewing materials (used to modify BOP uniforms), and unauthorized "street" clothing. (Id.) Respondent told Dr. Plaud the images were eventually returned to him. (Plaud Report (DE 20) at 12). During an interview with the BOP sex offender management program coordinator about this incident, respondent refused to discuss his past sex offense history and the program coordinator noted respondent was unwilling to acknowledge his problematic sexual behavior and did not have a desire to change. (Malinek Report (DE 16-1) at 20). Respondent informed the program coordinator he would participate in sex offender treatment but only after release from prison.[6] (Id. at 21).

Respondent was also accused of sexual harassment during his current period of incarceration. On July 24, 2015, an inmate accused respondent of propositioning him for sex. (Id.) On November 28, 2017, an inmate reported respondent repeatedly asked him to expose his genitals. (Id. at 21-22). On December 24, 2017, an inmate reported respondent "grabbed" him in a sexual manner. (Id. at 22). BOP investigated each of these incidents, found that the allegations were unsubstantiated, and no formal disciplinary proceedings were instituted. (See Resp't's Exs. 17, 19). As a result of these allegations, however, BOP classified respondent as a "moderate risk for abusiveness" and recommended that he not be housed with any inmates classified as at greater risk for sexual victimization. (Malinek Report (DE 16-1) at 22).

Respondent has been employed at "UNICOR" (a BOP employment program) for much of his incarceration, earning primarily positive performance evaluations. (Resp't's Ex. 9). Respondent

---

[6]At hearing, respondent testified certain items he received in the mail were rejected because of their sexual content. Respondent did not dispute BOP's decision to reject the mail. There is no evidence respondent was formally disciplined for this incident.

also completed a crochet class, basic leather class, and an acrylic class while incarcerated at FCI-Petersburg. (Malinek Report (DE 16-1) at 19).

At hearing, respondent testified he currently masturbates approximately two times a week, but also testified he at times abstains from masturbation for an entire week. He further testified that due to a recent medication change he sometimes has difficulty achieving an erection. Respondent denied any recurrent sexual urges or fantasies involving pubescent or prepubescent children, or any other deviant sexual activity.

## COURT'S DISCUSSION

A.     The Adam Walsh Child Protection and Safety Act

The Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, § 302, 120 Stat. 587, 619-22 (codified in 18 U.S.C. §§ 4241, 4247, and 4248), established a program for the civil commitment of individuals in the custody of BOP, and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). The commitment process is initiated when either the Attorney General, Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Adam Walsh Act. Id. (a); United States v. Timms, 664 F.3d 436, 439 (4th Cir. 2012).

Following such certification, the district court must conduct a hearing to determine if the person is sexually dangerous. 18 U.S.C. § 4248(d). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." Id. (d).

A "sexually dangerous person" is defined by statute as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."

17

18 U.S.C. § 4247(a)(5). "Child molestation," for purposes of § 4248, is defined in 28 C.F.R. § 549.93, which provides that "'child molestation' includes any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93. "Sexually violent conduct," for purposes of § 4248, is defined in 28 C.F.R. § 549.92, which provides as follows:

> "[S]exually violent conduct" includes any unlawful conduct of a sexual nature with another person ("the victim") that involves:
>
> (a) The use or threatened use of force against the victim;
>
> (b) Threatening or placing the victim in fear that the victim, or any other person, will be harmed;
>
> (c) Rendering the victim unconscious and thereby engaging in conduct of a sexual nature with the victim;
>
> (d) Administering to the victim, by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance, and thereby substantially impairing the ability of the victim to appraise or control conduct; or
>
> (e) Engaging in such conduct with a victim who is incapable of appraising the nature of the conduct, or physically or mentally incapable of declining participation in, or communicating unwillingness to engage in, that conduct.

28 C.F.R. § 549.92. The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

Thus, to satisfy the criteria for civil commitment under § 4248, the government must show by clear and convincing evidence that an individual: 1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; 2) currently "suffers from a serious mental

illness, abnormality, or disorder"; and 3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. §§ 4247(a)(5), (6), 4248(d); see also United States v. Comstock, 560 U.S. 126, 130 (2010). [C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001) (internal quotation marks, citations, and alterations omitted).

B.      Prong One - Prior Acts of Child Molestation or Sexually Violent Conduct

Respondent concedes prong one is satisfied. As set forth above, the evidence clearly establishes respondent has previously engaged in sexual acts with persons under age 18. As a result, the court finds by clear and convincing evidence that respondent has previously engaged in child molestation, and thus petitioner has satisfied its burden as to prong one.

C.      Prong Two - Mental Illness or Disorder

Prong two requires petitioner to establish, by clear and convincing evidence, that respondent currently suffers from a serious mental illness, abnormality, or disorder. 18 U.S.C. § 4247(a)(5), (6); Comstock, 560 U.S. at 130. The second prong thus requires examination of the psychiatric diagnoses proffered by the experts. Such diagnoses, however, are "merely the starting point for the court to consider the true thrust of the § 4247(a)(6) inquiry   whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment." United States v. Caporale, 701 F.3d 128, 137 n.4 (4th Cir. 2012).

Here, Dr. Malinek diagnosed respondent with pedophilic disorder, defined in the Diagnostic

19

and Statistical Manual of Mental Disorders as follows:

> A) over a period of at least 6 months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger);

> B) the fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

> C) the person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

(Malinek Report (DE 16-1) at 27 (quoting Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders Fifth Edition</u> 697 (2013) ("DSM-V"))).  Dr. Ross diagnosed respondent with other specified paraphilic disorder, sexually attracted to prepubescent and pubescent males, but at hearing testified that she agreed with Dr. Malinek's pedophilic disorder diagnosis.  Other specified paraphilic disorder is diagnosed using the same criteria to diagnose pedophilic disorder, with exception that it includes attraction to both pubescent and prepubescent minors.  (<u>See</u> Ross Report (DE 8-1) at 14-15).  Dr. Ross  testified at hearing that her diagnosis attempted to capture the complete clinical picture, which includes sexual attraction to <u>both</u> pubescent and prepubescent children.

Dr. Plaud disagreed with Drs. Malinek and Ross, opining there is no evidence respondent should be <u>currently</u> diagnosed with either pedophilic disorder or paraphilic disorder not otherwise specified.  Dr. Plaud emphasized that respondent has not committed a "hands on" sexual offense in the past 20 years, and no sexual offenses in the past 11 years, thereby suggesting respondent is not currently experiencing sexual attraction to pre or post pubescent minors and that such attraction is not causing clinically significant distress or impairment.  (<u>See</u> Plaud Report (DE 20) at 3).  At hearing, Dr. Plaud testified that psychiatric experts have consistently rejected efforts to include a

diagnosis related to sexual attraction to pubescent minors in the DSM-V, and thus in his opinion Dr. Ross's diagnosis of other specified paraphilic disorder, sexually attracted to pubescent males, is not sufficient to establish prong two.

The court finds petitioner has established by clear and convincing evidence respondent suffers from pedophilic disorder. The parties' disagreement regarding this diagnosis centers on Criterion A, that respondent has intense sexual urges or fantasies involving sexual activity with prepubescent children. Respondent admits he sexually molested a prepubescent boy in 1987. A PPG test conducted in 1988 also detected respondent was sexually attracted to prepubescent children (Pet'r's Ex. 9 at 162). In 1993, respondent approached a 13 year-old boy who may have been prepubescent, and admits he would have attempted to have sex with him if the boy had accepted his invitation to have lunch. (Malinek Report (DE 16-1) at 8). In 1996, respondent was found to be living with a 15 year-old minor, P.R., who had been living with him for potentially two years at the time and who respondent admittedly molested at the beginning of the relationship. (Id. at 9). Both of these thirteen year-olds may have been prepubescent. (Id. at 27 (reporting some 13 year-old males are prepubescent)). And in 2007, respondent possessed child pornography, which included extensive collection of images and videos of prepubescent children. Although respondent denies that he used the images of prepubescent children for masturbatory purposes, the court declines to credit such assertion given the large amount of images and videos of prepubescent children in the collection, and the fact the file names included search terms for prepubescent children, such as "preteen" and "PTHC" (pre-teen hard core).[7]

---

[7]At hearing, respondent's expert, Dr. Plaud, explained that respondent is "suggestible" and thus likely possessed the child pornography because his significant others at the time encouraged him to acquire it. Dr. Plaud's theory does not establish respondent is not sexually attracted to prepubescent males. Indeed, respondent himself testified at [cont.]

This evidence speaks to an enduring pattern of intense sexual attraction to prepubescent children, which satisfies criterion A of pedophilic disorder. As to criterion B, respondent's sexual attraction to prepubescent children has caused substantial impairment in functioning, as evidence by respondent's arrests and lengthy periods of incarceration for molesting a prepubescent child and possessing child pornography featuring (in part) prepubescent children. Indeed, with the exception of 30 months of supervised release, respondent has been continuously incarcerated since 1996 as a result of his child molestation and child pornography convictions. Criterion C is also satisfied, as respondent was over age 16 at the time of his offenses and at least 5 years older than the victims.

Respondent emphasizes that there is no evidence in the record he is currently attracted to prepubescent children. Respondent suggests that if he were truly attracted to prepubescent children, there would be evidence during his current incarceration of disciplinary infractions for possessing inappropriate pictures of prepubescent children or written stories featuring sexual abuse of such children. The court disagrees. Respondent's lack of prison infractions involving prepubescent children, standing alone, cannot overcome his lengthy history of attraction to prepubescent children spanning the majority of his (non-incarcerated) adult life. Moreover, respondent's incarceration has severely limited his access to pornographic and other materials featuring prepubescent children. That respondent has not possessed such materials speaks more to volitional control than absence of diagnosis. In sum, the court cannot reject a current diagnosis of pedophilic disorder based solely on the passage of eleven years since respondent last possessed sexual images of prepubescent children, particularly where respondent has been incarcerated during that time frame.

---

hearing that he viewed the subject pornography while engaging in sexual acts with his significant others. And respondent's prior PPG results and sexual offenses against prepubescent children belie his claims that he was not sexually aroused by the images/videos of prepubescent males.

Respondent would also meet criteria for diagnosis of hebephilia, defined the same as pedophilic disorder with the exception that sexual attraction is to pubescent and not prepubescent children. See Caporale, 701 F.3d at 133 (describing criteria for diagnosis of hebephilia). Dr. Ross's diagnosis of paraphilia not otherwise specified, sexually attracted to pubescent males, corresponds to a diagnosis of hebephilia. See id. at 137 & n.4. A diagnosis of hebephilia, if accompanied by the requisite evidence of functional impairment, can satisfy the second prong of the § 4248 analysis even though hebephilia is not a recognized DSM-V diagnosis. Id. at 137 n.4.

As set forth above, respondent has an extensive history of sexual attraction to pubescent children. Respondent admits, for example, molesting 10 to 15 pubescent children prior to 1996. And the child pornography found in respondent's possession in 2007 included multiple images and videos of pubescent children. As for current attraction, respondent stated to Dr. Malinek that teenage male bodies are "gorgeous," suggesting enduring sexual attraction to pubescent children. (Malinek Report (DE 16-1) at 18). As set forth above, respondent's sexual attraction to pubescent children has caused significant functional impairment, including lengthy periods of incarceration.

Drs. Ross and Malinek also diagnosed respondent with antisocial personality disorder and testified that such also disorder satisfies the second prong of the § 4248 analysis. Antisocial personality disorder consists of:

> a pervasive pattern of disregard for and violation of the rights of others that begins in childhood or early adolescence and that is manifested by acts that are grounds for arrest. For the diagnosis of Antisocial Personality Disorder, the individual must be at least eighteen years old and must have symptoms of conduct disorder before age fifteen. Individuals with Antisocial Personality Disorder often fail to conform to social norms with respect to lawful behavior, and repeatedly perform acts, which are grounds for arrest.

(Malinek Report (DE 16-1) at 28).

23

Petitioner has not established by clear and convincing evidence that respondent suffers from antisocial personality disorder. The court finds Dr. Plaud's testimony regarding the antisocial personality disorder diagnosis more credible than Drs. Ross and Malinek's testimony. Dr. Plaud notes that there is virtually no evidence in the past 11 years of failure to conform to social norms or pervasive disregard for the rights of others, as respondent's disciplinary history in BOP has been relatively offense-free.[8] Respondent's historical sex offenses are also better explained by his pedophilic disorder and hebephilia diagnoses than an underlying personality disorder. As Dr. Plaud testified at hearing, if antisocial personality disorder were truly present here, respondent would likely have an extensive criminal history apart from the sexual offenses. (See also Plaud Report (DE 20) at 18). That is simply not the case here.[9]

Dr. Plaud also testified that respondent's childhood burglaries    relied on by Drs. Ross and Malinek as evidence of conduct disorder before age 15    are more readily by respondent's chaotic, abusive childhood. Dr. Plaud testified respondent committed the burglaries so state authorities would place him in foster care away from his abusive stepfather and older brother, and explained that when a crime is committed out of necessity (such as when a starving person steals bread), it cannot serve as the basis for a diagnosis of antisocial personality disorder. This testimony was not meaningfully rebutted by Drs. Ross or Malinek. The court agrees with Dr. Plaud's analysis and finds

---

[8]As noted, respondent has incurred one disciplinary infraction for possessing unauthorized items during his current incarceration but otherwise it has been relatively offense-free. Although respondent was alleged to have sexually assaulted several inmates, those allegations were found to have been unsubstantiated.

[9]Drs. Ross and Malinek testified many individuals with antisocial personality disorder can conform to social norms in a structured environment, such as BOP, and thus only exhibit symptoms of the disorder when outside an institutionalized setting. But the Adam Walsh Act requires assessment of whether an inmate "currently" suffers from a mental illness, and thus the court cannot disregard respondent's behavior in prison, the only "current" information available. See Comstock, 560 U.S. at 130; United States v. Antone, 742 F.3d 151,168-169 (4th Cir. 2014) (holding district court must consider offense-free time during incarceration when conducting § 4248 analysis).

petitioner has not established by clear and convincing evidence that respondent suffers from antisocial personality disorder.[10]

Based on the foregoing, petitioner has established by clear and convincing evidence that respondent suffers from a serious mental illness, abnormality, or disorder within the meaning of the Adam Walsh Act   namely, pedophilic disorder and hebephilia.  Petitioner has not carried its burden, however, with respect to the antisocial personality disorder diagnosis.

D.     Prong Three - Serious Difficulty

The third prong requires petitioner to establish by clear and convincing evidence that respondent would have serious difficulty in refraining from sexually violent conduct if released. "The 'serious difficulty' prong of 4248's certification refers to the degree of the person's 'volitional impairment' which impacts the person's ability to refrain from acting upon his deviant sexual interest."  United States v. Hall, 664 F.3d 456, 463 (4th Cir. 2013) (quoting Kansas v. Hendricks, 521 U.S. 346, 358 (1997)); see also Kansas, 521 U.S. at 358 (noting that "civil commitment statutes [that] have coupled proof of dangerousness with the proof some additional factor, such as a 'mental illness' or 'mental abnormality' serve to limited involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.").

In evaluating the third prong, the court considers the following factors: 1) failures while on supervision; 2) resistance to treatment; 3) continued deviant thoughts; 4) cognitive distortions; 5) actuarial risk assessments; 6) impulsiveness; and 7) historical offenses.  See United States v. Wooden, 693 F.3d 440, 463 (4th Cir. 2012).  The court also examines whether respondent has prior

---

[10]The experts also diagnosed respondent with various forms of anxiety disorder, depressive disorder, and cannabis use disorder, but neither petitioner nor the experts argue that these disorders qualify as serious mental illnesses sufficient to establish prong two.

experience in the community without committing a hands on offense, respondent's ability to comply with institutional rules, experience with sex offender treatment, respondent's testimony regarding volitional control, and supervised release conditions.  Hall, 664 F.3d at 465-67.

The court finds petitioner has not established by clear and convincing evidence that as a result of his mental illnesses, respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released.  In the court's view, the most significant facts establishing respondent's volitional control are: 1) respondent spent 30 months in the community, between January 4, 2005, and July 17, 2007, without committing a contact offense; 2) respondent spent approximately two years in sex offender treatment between 2005 and 2007, and he did not commit a contact offense during that time or thereafter; 3) respondent is subject to stringent supervised release restrictions for the next five years; 4) when respondent's supervised release ends, he will be over 60 years old, an age in which respondent's risk of recidivism significantly decreases; and 5) respondent's current incarceration history suggests he has matured significantly while in prison.  As the experts were divided about the weight that should be afforded these (undisputed) facts, the court addresses them in further detail below.

1.    Respondent's Offense-Free Time in the Community

Dr. Plaud testified that respondent's recent time in the community without a contact offense is compelling evidence of volitional control.  The court agrees.  To the extent respondent is still having sexually deviant urges or fantasies, the fact that he did not commit a contact offense for 30 months while in the community is strong evidence that he is able to control such urges.  A person who currently has serious difficulty controlling their deviant sexual urges is not typically capable of spending 30 months in the community offense free.  See id. at 466 (holding district court properly

considered 28 months of offense free time in the community as probative of volitional control).

Drs. Ross and Malinek testified that respondent's time in the community should be discounted significantly (if not entirely) because respondent possessed child pornography during that time. The Adam Walsh Act, however, is only concerned with preventing contact offenses, and the court therefore rejects petitioner's argument that respondent's offense-free time in the community (as to contact offenses) should be discounted based solely on possession of child pornography. See id. (recognizing 28 months in the community without a contact offense is probative of volitional control even where respondent subsequently possessed child pornography).

Drs. Ross and Malinek's position also appears to be that possession of child pornography is a precursor to committing another contact offense because it evidences respondent is still experiencing deviant sexual urges. But they provide no empirical data suggesting a connection between possession of child pornography and future contact offenses. Indeed, experts in other § 4248 matters have testified possession of pornography "does not alone indicate a likelihood of a hands-on reoffense" and have "pointed to research suggesting that hands-on offenders who possess such materials have a lower recidivism rate than those who do not collect such materials." Hall, 664 F.3d at 465, 467. Additionally, as Dr. Plaud testified, respondent's history does not indicate he views child pornography as a precursor to committing contact offenses.

The court notes, with concern, that respondent was found in possession of toys, stuffed animals, and candy when he was arrested for the child pornography offenses. These materials could be used to groom children before sexual offending and thus his possession of them lends some support to Drs. Ross and Malinek's theory that possession of child pornography was a precursor to contact offenses. Respondent, conversely, told Dr. Plaud the items were for an art project, and he

intended to give them to his brother (who in turn would give them to his children) after the project was completed. (Plaud Report (DE 20) at 11). While the court agrees this is troubling evidence, the fact remains respondent spent 30 months in the community without a contact offense, and respondent's possession of potential grooming materials and child pornography standing alone does not discount that respondent exercised significant control over his urges while in the community.

2.      Respondent's Previous Sex Offender Treatment

At hearing, respondent credibly testified about the benefits he received from sex offender treatment he participated in between 2005 and 2007. Respondent expressed significant remorse for his prior offenses, and explained how he planned to prevent himself from re-offending in the future. Respondent testified that he now understands his offense cycle, which begins with deviant sexual urges, progresses to grooming behaviors, and then to re-offending. Respondent further testified that he can now identify his risk factors, such as unsupervised contact with children or negative social influences, and thus stop the cycle before it progresses to reoffending. The court found respondent's testimony, including his expressions of remorse and his discussion of his relapse prevention plans, to be credible. As Dr. Plaud notes, respondent appears to have internalized at least part of his treatment because he did not commit a contact offense during treatment or after it ended.

Drs. Ross and Malinek testified respondent could not have internalized treatment because he possessed child pornography shortly after treatment ended.[11] The court agrees that respondent's possession of child pornography suggests respondent did not fully benefit from treatment. But respondent's lack of contact offending and his testimony at hearing (in which he discussed coping

_____

[11]Drs. Ross and Malinek testified that respondent's possession of child pornography means he was a "treatment failure." As set forth above, the court disagrees with this characterization.

strategies he learned over 11 years ago) suggest that he has internalized at least some coping strategies from his prior treatment.

Dr. Malinek also focused on respondent's refusal to attend sex offender treatment while in BOP custody, citing this fact as evidence that respondent does not have the necessary coping strategies to abstain from contact offenses and that he is resistant to further sex offender treatment. Respondent states that he refused to participate in BOP sex offender treatment on advice of counsel. (Resp't's Proposed Findings (DE 18) at 18). The court does not agree that respondent's refusal to attend BOP treatment indicates he is not motivated to attend post-release outpatient treatment. Respondent, on advice of counsel, presumably refused BOP sex offender treatment because any statements he provided in the course of such treatment could have been used against him in this civil commitment proceeding. See Antone, 742 F.3d at 167 n.12 (finding respondent's refusal to participate in BOP sex offender treatment cannot be held against him in § 4248 proceeding where "any treatment received would be at the cost of providing the Government with additional fodder to use against him [in forthcoming § 4248] proceedings").

Additionally, the court disagrees with Dr. Malinek's assessment that respondent does not have sufficient prior experience in treatment, or sufficient motivation to attend treatment, to succeed in the community. As set forth above, respondent has internalized numerous important coping strategies for avoiding contact offending in the community, and his mandatory outpatient sex offender treatment should be sufficient to cover any deficits. Respondent credibly testified at hearing that he enjoyed his prior treatment experience and intends to resume treatment after his release. Dr. Plaud also testified he believes respondent will devote himself to treatment if released.

3.      Respondent's Supervised Release Conditions

As set forth above, respondent will be subject to stringent supervised released conditions upon release from BOP custody, for a period of five years.  Conditions include, among others, mandatory sex offender treatment, refraining from contact with minors, refraining from viewing pornography, refraining from using electronic devices capable of connecting to the internet, and refraining from being present within 100 feet of places where minor children congregate, such as playgrounds and schools.  (Pet'r's Ex. 5 at 3-4).

Drs. Ross and Malinek testified these conditions are not sufficient to mitigate respondent's risk of re-offense, in light of respondent's actuarial risk assessments (discussed further below), and respondent's prior "failure" while on supervised release.  Dr. Ross also testified that respondent typically grooms minors in public shopping areas, not at playgrounds or schools, so GPS monitoring of respondent's whereabouts will not be a useful deterrent in this case.

While the court notes these concerns, respondent's extensive supervision conditions remain a protective factor in this case.  Respondent risks violation of supervised release and return to BOP custody if he fails to attend treatment and otherwise comply with these stringent supervised release conditions.  See Hall, 664 F.3d at 466 (noting district court properly considered "supervised release that includes substantial restrictions designed to prevent . . . reoffending" when weighing volitional control prong).  And while it is true respondent violated the terms of his prior supervised release in 2007 by possessing child pornography, respondent has never had a contact offense while on supervision.

4.      Respondent's Age

As noted, respondent will be over 60 years old at time he completes his five-year term of

supervised release. Dr. Plaud testified persuasively that individuals over age 60 are at significantly

reduced risk of sexual re-offense, and that when age is considered in context of the other protective

factors in this case set forth above, respondent's risk of re-offense is actually quite low. Some

empirical data place the risk of re-offense for offenders over age 60 at less than 4%. (Plaud Report

(DE 20) at 24).

Petitioner argues age is not a protective factor here because respondent has self-reported that

he continues to masturbate two times per week, and thus his sex drive has not diminished. Dr.

Malinek also testified respondent's age cannot overcome respondent's overall risk profile.[12]

The court finds Dr. Plaud's position that age is a significant protective factor in this case to

be more persuasive. Respondent has shown remarkable volitional control over the past 20 years

because he has not had any contact offenses during that time either while incarcerated or during his

30 months in the community. As Dr. Plaud notes, the issue is current volitional control, not current

sex drive, and respondent's advanced age and increased maturity when considered in conjunction

with the other evidence in this case support the view that respondent will not have serious difficulty

refraining from re-offense if released.[13] (Id. at 2). The data provided by Dr. Plaud show that for the

majority of sex offenders, risk of re-offense decreases significantly after age 60, and the government

has not shown by clear and convincing evidence that such analysis should not apply to respondent.

(Id. at 24).

The court also disagrees with Dr. Malinek's analysis that age cannot mitigate respondent's

---

[12]The court addresses Dr. Malinek's actuarial assessments and risk analysis in further detail below.

[13]Petitioner also does not provide support for the implicit theory that age is a protective factor solely because sex drive decreases at age 60. Indeed, a number of factors independent of sex drive may contribute to lower recidivism rates after age 60. (See, e.g., Malinek Report (DE 16-1) at 41 (noting "criminal misconduct [in general] normally declines with age"))

overall risk profile. Respondent's time in the community without a hands on offense, his prior sex offender treatment and ability to identify coping strategies, his stringent supervised release conditions, and his incarceration history, when coupled with his advanced age, suggest petitioner's risk of re-offending is relatively low.

5.    Incarceration History

Finally, the court notes respondent has only incurred one disciplinary infraction, for possession of unauthorized items, in the past 10 years. Respondent's minor prison infractions suggest he has matured significantly during his time in BOP custody, and that he now has volitional control over his deviant sexual urges. As respondent emphasizes, he has not been found in possession of any inappropriate images of children[14] or other problematic material, such as written stories about sexual abuse of children, while in BOP custody. While Drs. Malinek and Ross emphasize many sex offenders are model prisoners but re-offend when released to the community, the court must consider respondent's prison behavior when examining the volitional control prong. See Antone, 742 F.3d at 169 (holding district court must consider respondent's subsequent growth after the subject offenses, even if such growth occurred while incarcerated).

At hearing, Dr. Ross testified that possession of unauthorized sewing materials should be considered a significant infraction because respondent altered prison uniforms such that inmates could conceal contraband. Possession of sewing materials may be a significant infraction, but the

_____

[14]As noted, prison officials found some images in respondent's cell of young adult males who appeared to be dressed as teenagers, which were later returned to respondent and were not introduced into evidence by the government. But even assuming respondent possessed sexually explicit images of adults dressed as teenagers, that conduct when considered in conjunction with respondent's otherwise relatively spotless record would not change the court's conclusion that respondent's incarceration history supports a finding that respondent has achieved volitional control. See Antone, 742 F.3d at 167 n.12 (characterizing possession of sexually explicit magazine as a minor prison infraction that standing alone cannot support a finding of lack of volitional control).

fact remains respondent has only had one infractions during his entire 10-year sentence. In addition to his limited disciplinary infractions, respondent also has been consistently employed throughout his incarceration, earning largely positive performance evaluations. (Resp't's Ex. 9). As a whole, respondent's incarceration history demonstrates ability to conform to social norms, follow rules and regulations, and consistent growth and maturity. One infraction for possession of sewing materials is not sufficient to discount his entire record.

In his report, Dr. Malinek repeatedly cited to the alleged sexual harassment incidents, which purportedly occurred in 2015 and 2017, as evidence of lack of volitional control. (See, e.g., Malinek Report (DE 16-1) at 41 ("If he is unable to restrain himself from inappropriate sexual acting out in custody [referring to 2017 sexual harassment allegations], there are significant doubts that he would be able to do so in a less restrictive setting")). As set forth above, BOP itself found each of the alleged sexual harassments incidents were "unsubstantiated"[15] and petitioner has not otherwise presented the court with evidence they actually occurred. (See Resp't's Exs. 17, 19). Thus, the court does not consider them competent evidence in this matter.

6.  Remaining Wooden Factors

The court next turns to the remaining relevant Wooden factors not specifically addressed above, including Drs. Ross and Malinek's actuarial assessments and risk factor analyses, cognitive distortions and deviant thoughts, and historical offenses.

Drs. Ross and Malinek evaluated respondent using actuarial assessments (the Static-99R and Static-2002R), finding respondent's risk of re-offense in five years to be between 25% and 30%

---

[15]At least one of these findings may have occurred after Dr. Malinek drafted his report.

within five years.[16]  (Ross Report (DE 8-1) at 17-18; Malinek Report (DE 16-1) at 37-39).   Drs. Ross and Malinek also evaluated respondent using static and dynamic risk factors, and found multiple risk factors present in this case, including, among others, sexual preoccupation, deviant sexual interest, lifestyle impulsivity, resistance to rules and supervision, negative social influences, and intimacy deficits.   (Ross Report (DE 8-1) at 18-20; Malinek Report (DE 16-1) at 31-36).

The court has reviewed and considered Drs. Ross and Malinek's actuarial assessments and risk factor analyses, and concludes that these analyses cannot overcome Dr. Plaud's conclusion that respondent currently has volitional control and is not sexually dangerous to others.  The Static-99R and Static-2002R scores did not take into account respondent's time in the community without a contact offense, his recent incarcerative behavior, his age, or his experience in sex offender treatment.  Petitioner notes the actuarial assessments did not give respondent credit for offense-free time in the community, age over 60, or completion of sex offender treatment because he possessed child pornography while in the community, he has not yet reached age 60, and he did not formally complete treatment.  As noted above, however, respondent's time in the community without a contact offense is significant evidence of volitional control, respondent completed nearly two years of sex offender treatment (and only stopped participating when the contract was not renewed), and respondent will be on stringent supervised release conditions until age 61.

Moreover, even if the court were to fully credit Drs. Ross and Malinek's estimate that

---

[16]Respondent's estimated recidivism risk on the Static-2002R was 34.3% in five years, slightly higher than 30%. But according to Dr. Malinek, respondent's score on the Static-99R produced an estimated recidivism risk of 25.7% in five years, so the court averaged these two figures to produce a ceiling of 30% risk of recidivism at five years.  Drs. Ross and Malinek further estimated respondent's recidivism risk to be approximately 35% to 40% at 10 years.  Dr. Plaud testified, however, that the most reliable Static-99R/Static-2002R data involves five-year recidivism rates, and Drs. Ross and Malinek did not contest that assessment.  Accordingly, the court uses the data for the five-year recidivism risk in this case.

respondent's risk of re-offense is 30% at five years (and it does not, for the reasons explained above), that still leaves a greater than 70% chance respondent will not re-offend. Given the evidence of volitional control in this particular case set forth above, the actuarial assessments do not leave the court with a definite and firm conviction respondent will commit another contact sex offense if released.

As to Drs. Ross and Malinek's risk factor analysis, the court notes that many of these factors were scored using primarily historical data, including negative social influences, lifestyle impulsivity, resistance to rules, and intimacy deficits. As set forth in detail above, respondent has largely complied with BOP rules during his most recent 10-year incarceration, suggesting he currently does not have lifestyle impulsivity or resistance to rules. At hearing, respondent also credibly testified that he actively attempts to avoid negative social influences in prison.[17] And as respondent has been incarcerated for the past ten years, current intimacy deficits do not provide evidence of lack of volitional control. Moreover, as Dr. Plaud persuasively explained in his report, the predictive validity of many risk factors (including sexual deviation) significantly decrease when an offender approaches age 60. (Plaud Report (DE 20) at 24). Accordingly, the risk factor analyses do not provide strong evidence of current lack of volitional control or otherwise significantly affect the court's conclusion that respondent currently does not present a high risk for re-offense.

The parties also dispute whether respondent has cognitive distortions about his sexual

---

[17]Dr. Ross testified that BOP records indicate respondent recently corresponded over email with an individual who has previously been convicted of a sex offense. Dr. Ross also testified, however, that the content of the conversation was not deemed to be risk relevant. In the absence of more evidence about the content of the correspondence or how this particular individual is a negative social influence, the court cannot give this testimony any weight. The court's understanding is that sex offender treatment involves participation in group therapy with other sex offenders and that reformed sex offenders can be important components of an offender's support network, so mere contact with other individuals who have previously been convicted of sex crimes standing alone does not evidence negative social influences.

offending. At hearing, Drs. Ross and Malinek testified that respondent blames others for committing the offenses, including O'Brien, the co-defendant in the 1996 offenses, and his 2007 significant others. In contrast, respondent testified that he took full responsibility for his offense conduct, including possession of child pornography, and that he was "incredibly" remorseful that he had hurt children. While respondent testified that his co-defendant, O'Brien, influenced his decision to approach children and make sexual advances, respondent repeatedly reaffirmed that he was responsible for abusing the children. The court finds respondent's comments were credible. And as Dr. Plaud notes, there is no evidence in the record suggesting respondent blames his actual victims, or otherwise currently believes they invited his sexual advances.[18] Accordingly, the court finds no evidence of current cognitive distortions that would affect respondent's ability to refrain from future sexual offenses.

Against the foregoing analysis, the court must weigh respondent's prior offense conduct, and historically-based risk factors. See Caporale 701 F.3d at 142 n.7 ("For a court assessing the likelihood of recidivism upon a respondent's proposed release among the general public, an examination of the respondent's criminal conduct undertaken in the same setting   though having occurred a number of years past   may be the most probative predictor."). There is no dispute respondent committed heinous and reprehensible contact offenses against vulnerable children, albeit

---

[18]At his deposition, respondent testified that he would not have abused B.H., the 12 year-old prepubescent boy from respondent's 1987 offenses, if J.W. had "not brought him around." (Resp't's Ex. 3 at 53:1-15). But respondent also emphasized, "I was absolutely wrong to do anything with either [J.W. or B.H.]." (Id.) Additionally, respondent's deposition and hearing testimony, when considered as a whole, does not suggest respondent blames any of his victims or otherwise believes O'Brien or his 2007 significant others forced him to commit any of these offenses. (See, e.g., id. at 80:6-10 (discussing O'Brien, "[t]he man gave me money, gave the kid money, and we produced the film. I was in it. I'm just as much to blame as him."); id. at 121:10-15 ("Looking back on that, I should have never gotten involved with them, those young males, 19 and 25 years old. Is it my fault? I'll take responsibility. I had it. I can't say they coerced me into it . . . .")).

36

over 20 years ago. Moreover, as petitioner notes, the offenses were committed multiple times over a period of time constituting the majority of respondent's non-incarcerated adult life. These historical offenses, when considered together with respondent's <u>history</u> of sexual preoccupation, deviant thought patterns, negative social influences, resistance to rules, and the actuarial risk assessments, obviously weigh in favor of commitment. When weighed against the more recent evidence of volitional control set forth above, however, the court is not left with a definite and firm conviction that respondent currently would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

Finally, the court notes this case is not materially distinguishable from the facts in <u>United States v. Hall</u>, a case in which the Fourth Circuit affirmed the district court's order finding respondent was not a sexually dangerous person under the Adam Walsh Act. In <u>Hall</u>, the Fourth Circuit described the evidence on the volitional control prong as follows:

> As noted above, the district court clearly considered and weighed the testimony of the experts and of Hall. The experts considered actuarial tests, psychological tests, and Hall's individual circumstances, and made clinical judgments based upon their evaluations. The actuarial tools relied upon by the experts yielded a group recidivism rate of individuals who scored similarly to Hall in the moderate to moderate-high range. Depending upon the group to which Hall was compared and the particular test employed, the range spanned from approximately a 10% to 36% recidivism rate over a ten-year period. In the end, however, the core of the experts' disagreement centered not so much on the actuarial tools or the group rates of recidivism, as it did on the results of Hall's psychological tests, his individual circumstances, and the experts' respective interpretations of whether and to what extent Hall's circumstances affected his ability to control his sexual urges towards prepubescent children.
>
> As noted by the district court and Dr. Rosell, Hall has had a limited number of hands-on child molestation offenses and victims, particularly when compared to other pedophiles. And while the record evidence indicates that Hall had somewhat limited success in various sex offender treatment programs, it is undisputed that Hall participated in such treatment and was instructed in, among other things, coping skills to deal with his pedophilia. In sum, Hall was convicted of two offenses

involving child molestation, his last child molestation offense occurred in 1999, and he spent a total of approximately twenty-eight months in the community (between April 2004 and January 2007), after completing the sex offender treatment program at FCI Butner, without any reported hands-on child molestation offense.

Additionally, the district judge who was in a position to observe Hall's testimony, found him to be credible, and relied upon his testimony in making his findings. Hall testified that he is remorseful, understands the damage he caused his prior victims, and understands the risks of reoffense. He also testified that he has developed coping skills to keep him from acting upon his impulses, and that he employed these coping strategies while in the community on supervised release. Finally, Hall faces a 25 year period of supervised release that includes substantial restrictions designed to prevent his reoffending and the risk of life imprisonment if he does reoffend. Thus, while the district court found Hall's time in the community without reoffense "to be a persuasive factor that Mr. Hall will not recidivate," it is clear to us that the district court did not place exclusive or controlling weight upon this single factual finding.

Finally, we cannot say that the district court's finding that Hall is not sexually dangerous is clearly erroneous. Weighed against the evidence found most persuasive by the district court was Hall's troubling history of failing to comply with institutional rules and supervised release conditions, as well as his continued sexual interest in pictures and drawings of prepubescent children. As the experts noted, Hall's pedophilia and antisocial personality disorder have led him to continue to break rules and to seek out inappropriate sexual materials. Dr. Arnold and Dr. Demby placed great weight upon this non-contact misconduct as evidence that Hall would also have serious difficulty refraining from acting upon his pedophilic urges if released. Dr. Rosell, however, testified that Hall's non-contact misconduct does not alone indicate a likelihood of a hands-on reoffense, and concluded that Hall's behavior while confined at FCI Butner was not sufficient, in his opinion, to overcome the other circumstances that indicated that he would not likely reoffend. The government presented no evidence upon which we could conclude that Dr. Rosell's interpretation of Hall's possession of these materials was unreasonable, and the district court did not clearly err in crediting Dr. Rosell's opinion over those of Dr. Arnold and Dr. Demby.

United States v. Hall, 664 F.3d 456, 466 67 (4th Cir. 2012). Here, similar to the evidence relied upon in Hall, respondent's most recent contact offense was over 20 years ago, respondent spent 30 months of that time in the community without committing a contact offense, respondent has previously engaged in sex offender treatment and can articulate his risk factors and relapse

prevention plans, and respondent faces stringent supervised release conditions upon release (though for only a 5-year period as opposed to 25 years). And contrary to Hall, respondent has not possessed any images of underage minors while incarcerated.[19] Thus, "the relative strength of the parties' evidence . . . paint[s] a picture that is more reminiscent of Hall . . . than Wooden [a case in which the Fourth Circuit reversed the district court's finding the respondent was not sexually dangerousness]." Caporale, 701 F.3d at 142.

## CONCLUSION

Based on the foregoing, the court finds petitioner has not established by clear and convincing evidence that respondent satisfies criteria for commitment as a sexually dangerous person under § 4248. The court therefore orders that respondent be released from BOP custody as soon as reasonably practical to begin serving his five-year term of supervised release. The petition is DISMISSED, and the clerk of court is DIRECTED to close this case.

SO ORDERED, this the 8th day of August, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge

---

[19]The court recognizes that Hall was found to have only committed two contact offenses, while respondent has admitted to at least 10-15 victims, and even more individual offenses. That distinction does not alter the court's analysis, particularly where respondent's contact offenses occurred over 20 years ago.